In re D.H. OVERMYER TELECASTING CO., INC., Debtor.

D.H. OVERMYER TELECASTING CO., INC., et al., Plaintiffs,

v.

LAKE ERIE COMMUNICATIONS, INC., Defendant.

Bankruptcy No. B81–00506.

Adv. No. B81–1360.

United States Bankruptcy Court, N.D. Ohio, E.D.

Nov. 30, 1983.

Kevin T. Duffy, Parks, Eisele, Bates & Wilsman, Cleveland, Ohio, for plaintiff-debtor, D.H. Overmyer Telecasting Co., Inc.

Susan B. Collins, Baker & Hostetler, Columbus, Ohio, and William S. Eggeling, Ropes & Gray, Boston, Mass., for plaintiff, The First National Bank of Boston.

David F. Snow, Marilyn Shea-Stonum, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendant, Lake Erie Communications, Inc.

David O. Simon, Dettelbach & Sicherman Co., L.P.A., Cleveland, Ohio, for Creditors' Committee.

## MEMORANDUM OF OPINION

JOHN F. RAY, Jr., Bankruptcy Judge.

This matter is before the Court on the complaint of D.H. Overmyer Telecasting Co., Inc. ("Telecasting") and The First National Bank of Boston ("FNBB"), alleging that Lake Erie Communications, Inc.

("Lake Erie") violated the automatic stay provisions of the Bankruptcy Code, in particular Section 362(a)(3),[1] and the motion of Lake Erie to dismiss or, alternatively, for summary judgment.

In its complaint, Telecasting alleges that Lake Erie has violated the automatic stay provisions of Section 362 by filing an application with the Federal Communications Commission ("FCC") for a construction permit for a broadcasting station. Lake Erie's application is in competition with Telecasting's application for renewal of its own broadcasting license; the two applications are mutually exclusive. Telecasting and FNBB also assert that Lake Erie's application is an attempt to obtain possession of Telecasting's studio and transmitter equipment without a court order. Telecasting and FNBB seek a judgment declaring that Lake Erie willfully hindered Telecasting's reorganization attempts, and also seek appropriate remedial relief.

The issues before the Court are:

1. Whether Telecasting's license constitutes property of the estate; and

2. Whether Section 362(a)(3) prohibits the filing of competing applications before the FCC while Telecasting is seeking to renew its license.

 Telecasting's FCC license is not "property of the estate", as commonly defined. It is a right granted by a government agency, subject to use restrictions imposed by that agency. The FCC has the authority to strip Telecasting of its broadcasting license, and may also refuse to allow Telecasting to transfer or assign its license. Such actions are exempted from the automatic stay under the "governmental unit" exception contained in Section 362(b)(4) of the Bankruptcy Code.[2] If Lake Erie's application is successful, the number of potential purchasers for Telecasting's broadcasting equipment would be limited; Telecasting would essentially be forced to sell to Lake Erie the new FCC license. This result does not interfere with any property rights held by Telecasting, and neither Section 362(a)(3) nor Section 105[3] of the Bankruptcy Code should be interpreted as prohibiting Lake Erie from filing.

An FCC broadcasting license is a property right only in a limited sense. *Crowder v. FCC*, 399 F.2d 569, 571 (D.C.Cir.), *cert. denied* 393 U.S. 962, 89 S.Ct. 400, 21 L.Ed.2d 375 (1968); *MG–TV Broadcasting Co. v. FCC*, 408 F.2d 1257, 1264 n. 21 (D.C.Cir. 1968). An FCC licensee may transfer or assign its license only with the approval of the FCC. 47 U.S.C. § 310(d). The FCC retains continuing jurisdiction over Telecasting's license, despite the Chapter 11 proceeding. *See LaRose v. FCC*, 494 F.2d 1145 (D.C.Cir.1974).

The limited proprietary nature of Telecasting's license is demonstrated by the FCC's right to disapprove any transfer of that license, even if that transfer is approved by a bankruptcy court. In the case of *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983), the debtor had been granted over 400 landing slots at various airports by the Federal Aviation Administration ("FAA"). Shortly after the debtor filed under Chapter 11 of the Code, the FAA assigned 100 of those landing slots to other airlines. The FAA, debtor and certain

---

1. 11 U.S.C. § 362(a)(3) provides:
 (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title operates as a stay, applicable to all entities, of—
 　(3) any act to obtain possession of property of the estate or of property from the estate;

2. 11 U.S.C. § 362(b)(4) provides:
 (b) The filing of a petition under section 301, 302, or 303 of this title does not operate as a stay—

(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

3. 11 U.S.C. § 105 provides:
 (a) The bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.
 (b) Notwithstanding subsection (a) of this section, a bankruptcy court may not appoint a receiver in a case under this title.

creditors entered into a stipulation that the slots would be returned to Braniff should it, or a successor in interest, resume operations. Six months later, Braniff filed for court approval of a proposed understanding with Pacific Southwest Airlines ("PSA"). The bankruptcy court and, subsequently, the district court approved the PSA transaction, and ordered the FAA to allocate 100 landing slots to Braniff so that it could transfer them to PSA. The FAA appealed.

On appeal, Braniff argued that the slots were property of the estate, and that under Section 105 of the Code, the bankruptcy court had authority to issue whatever orders it thought necessary to protect that property. The Fifth Circuit disagreed, holding that the landing slot allocations were "rules" as defined in the Administrative Procedure Act; the slots were held to be restrictions on the use of property (airplanes), and not property in themselves. As such, the Fifth Circuit held that the slots were not within the jurisdiction of the bankruptcy court. 700 F.2d at 942.

The Fifth Circuit also stated its ruling would not have changed if the slots had been property of the debtor. Braniff argued the bankruptcy court could stay regulatory proceedings which threatened assets of the debtor; that since the FAA decision to withdraw landing slots threatened Braniff property, the court could intervene. Rejecting this argument, the circuit court said: "... whatever vitality the 'threat to assets' theory may have, it is inapplicable where, as here, the very existence of the 'asset' depends on the regulatory activity in question." 700 F.2d at 442, n. 5.

*In re Braniff* would dispose of the case at bar if the relief sought by Telecasting and FNBB were directed at the FCC itself. This court could hold that Telecasting's license was not a property right, but a "rule" designed to regulate Telecasting's use of its studio and transmitting equipment. As such, this court could hold that the FCC has exclusive jurisdiction over the license, and that the stay provisions of the Code do not apply. Alternatively, this court could hold that the license is an asset of the estate, but that the existence of the license itself depends upon FCC regulatory activity and, therefore, no injunctive relief is warranted.

Telecasting's complaint seems to have anticipated this reasoning. Rather than seek injunctive relief directly against the FCC, Telecasting has named Lake Erie, a private party, as defendant. Logically, this difference should be immaterial. If the FCC can take away Telecasting's license, private parties should be permitted to apply to the FCC to become the new licensee, without violating the stay. What little case law exists on this point seems to support such a conclusion.

In *California Oil Co. v. Huffstutler,* 322 F.2d 596 (5th Cir.1963), California Oil Company instituted a hearing before the Louisiana Conservation Commission to revise certain drilling and production units in oil fields which were subject to state regulation. Some of the units at issue were property of the debtor, and the district court issued a restraining order to bar California Oil from proceeding before the Commission. The district court cited Section 116(4) of the Bankruptcy Act, which allowed bankruptcy courts to stay actions against property of the debtor.

On appeal, the Fifth Circuit dismissed the injunction. While recognizing the authority of bankruptcy courts to protect the property of debtors, the circuit court also considered the countervailing policy favoring state control of natural resources. Absent clear intent by Congress to place control of natural resources in the hands of bankruptcy courts, the Fifth Circuit reasoned the district court had no authority to issue its injunction.

Since it involved proceedings by a state, rather than a federal regulatory agency, *California Oil* is distinguishable from the case at bar. It is worth noting, however, that the cases cited by the Fifth Circuit as precedent for its decision all involved attempts to restrain state agencies from acting against property of the debtor. Debtor named the regulatory agency as defendant. Even though the defendant in *California*

*Oil* was a private party, the Fifth Circuit apparently did not consider this distinction of any consequence. If the actions of regulatory agencies were exempt from the stay, private petitions invoking the authority of the regulatory agency were also exempt.

In support of its assertion that it has a valid claim for relief, Telecasting relies almost exclusively upon the case of *Jordan v. Randolph Mills, Inc.*, 29 B.R. 398 (D.C.N.C. 1983). In that case, Randolph Mills, the debtor, filed for reorganization under Chapter XI of the 1898 Act. The debtor owned land on which there were two abandoned dams which were not part of the debtor's business. Jordan's company was interested in acquiring the dam sites to generate hydroelectric power. When he filed applications with the Federal Energy Regulatory Commission ("FERC") for preliminary permits to study the dams' potential, Randolph Mills told the FERC of the reorganization proceedings and the order of the bankruptcy court restraining actions against the debtor's property. The FERC issued the preliminary permits to Jordan on November 18, 1980. Almost a year later, Jordan applied to the FERC for a license to operate the dams.

Meanwhile, the debtor received an offer from William Lee to purchase one of the dams. Lee's offer was conditioned upon there being no pending license applications for FERC permits to operate the dam. The debtor sought and received approval of the sale by the bankruptcy court.

The bankruptcy court, upon debtor's motion, cited Jordan for contempt in filing his FERC application. The FERC intervened on appeal to the district court, which upheld the contempt citations. While conceding that "Jordan's actions did not deprive the debtor of any property rights," 29 B.R. at 403, the district court held that Jordan was in contempt for failing to seek relief from the restraining order before filing with the FERC. Since Jordan's license application negated the possibility of the sale to Lee, Jordan's actions interfered with the debtor's attempt to reorganize and were subject to the contempt powers of the bankruptcy court.

On appeal, the Fourth Circuit vacated the district court order. *Jordan v. Randolph Mills, Inc.*, 716 F.2d 1053 (4th Cir.1983). The appeals court first noted that the highest use for the land was for a hydroelectric project. Any frustration of debtor's reorganization efforts occurred because the debtor refused to deal with Jordan. "If the pendency of the license application had any effect upon the debtor's property or the completion of the Chapter XI proceedings, it is entirely indirect and collateral. The debtor's property rights have not been diminished, and the debtor is still in the position that if it wishes to realize the potential value of its property, it must deal with one licensed by the FERC or one in a position to obtain such a license." *FERC v. Randolph Mills, Inc., supra,* at 1056.

The Fourth Circuit decision effectively disposes of Telecasting's complaint. The first count, alleging an attempt by Lake Erie to interfere with Telecasting's property, is answered by the Fourth Circuit's reasoning that a license granted by the government is not property of the estate. This reasoning parallels that of *In re Braniff, supra,* and reaffirms the idea that attempts by licensing authorities to revoke debtors' licenses are not stayed by bankruptcy proceedings. *See In re Thomassen,* 15 B.R. 907 (Bkrtcy.App. 9th Cir.1981).

Telecasting's first count also alleges that Lake Erie's license application is an attempt to obtain possession of Telecasting's studio and transmitter equipment without a court order. An FCC license alone would not give Lake Erie possession of the equipment; Telecasting and Lake Erie would have to agree upon a fair price or, if they could not, Telecasting could sell to another purchaser. Obtaining an FCC license and obtaining Telecasting's broadcasting facilities are two separate processes. Even if FCC licensees (like FERC licensees) were given eminent domain powers, *Jordan v. Randolph Mills* indicates that Section 362 would not operate to stay attempts to obtain an FCC license.

■ The second count of Telecasting's complaint alleges that Lake Erie's applica-

tion "willfully hindered, delayed and prevented the effective reorganization" of Telecasting. This count is also negated by the Fourth Circuit decision, which recognized that the injunctive powers of the bankruptcy court should not be used to force a licensing agency to prefer one applicant over the other. Telecasting's position in the instant case is similar to that of William Lee, the conditional purchaser in *Jordan, supra.* Telecasting, like Lee, seeks to use the stay provisions of the Code to restrict the discretion of the licensing agency. Telecasting seeks to extend its license, while Lee sought to become the licensee. Both attempts ignore the nature of rights of a licensee. The FCC license, like the FERC permit in *Jordan,* is an exercise of the government's plenary power over the public airwaves. Any attempt by a licensee or permit holder to use bankruptcy proceedings to limit the discretion of the regulatory body would be an attempt to enhance the debtor's property rights, contrary to the purpose of the Code. *See, e.g., First Federal Savings & Loan Ass'n. v. Booth,* 18 B.R. 816, 817 (Bkrtcy.E.D.Ark.1982).

Based upon the foregoing, the motion of Lake Erie Communications, Inc. for summary judgment should be granted.