

William J. Tucker, Christopher S. Roberge, Tucker, Surface & Fehribach, Indianapolis, IN, for receiver.

Charles Glerum, Lorraine M. Brennan, Choate, Hall & Stewart, Boston, MA, for plaintiffs.

C. Barton Adcox, Phelps, Owens, Jenkins, Gibson & Fowler, Tuscaloosa, AL, John W. Hough, Hough & Cook, Chicago, IL, for defendants.

Daniel J. Carragher, Day, Berry & Howard, Boston, MA, for claimant.

---

**STATE STREET BANK AND TRUST COMPANY and Bay Bank Boston, N.A., Plaintiffs,**

v.

**ARROW COMMUNICATIONS, INC., Arrow Communications of Alabama, Inc., and Arrow Communications of Utica/Rome, Inc., Defendants.**

Civ. A. No. 92–11436–WD.

United States District Court, D. Massachusetts.

April 29, 1993.

*MEMORANDUM AND ORDER*

WOODLOCK, District Judge.

The issue before me is whether, and if so, to what degree, a lien on a broadcast license may be recognized in a receivership proceeding involving the assets of the license holder. In this case, I find that such a lien may be recognized in the proceeds of the sale of a radio station, at least so long as the Federal Communications Commission, after being apprised of the lien, interposes no objection.

On June 19, 1992, I appointed a receiver for the assets of Arrow Communications, Inc., and its affiliated companies ("Arrow"). On January 25, 1993, I authorized the receiver to sell radio station KMJC–FM, one of Arrow's assets, but required him to retain the proceeds of the sale pending resolution of claims by various parties asserting themselves to be Arrow's creditors. The State Street Bank and Trust Company and Bay Bank Boston, N.A. ("Banks"), assert that they are secured creditors of Arrow in the sum of more than $9,000,000. David Dulany asserts he is an unsecured creditor of Arrow in the sum of approximately $260,000; and

that the Banks have no lien interest in so much of Arrow's assets as are reflected in the broadcast license.

## I

Arrow owns several radio stations, and operates them under license from the FCC. In September, 1989, Arrow entered into a Revolving Credit and Loan Term Agreement with the Banks, by which the Banks gave Arrow a $9 million line of credit, secured by a lien on Arrow's tangible and intangible property, among other security interests. Section 1 of the Security Agreement provides the Banks a first lien on Arrow's rights under various licenses:

> [Debtor grants lien on] [a]ll fixtures and all tangible and intangible personal property of each Debtor ... including, without limitation ... general intangibles ... including, without limitation, all of such Debtor's rights under all present and future authorizations, permits, licenses and franchises heretofore or hereafter granted to such Debtor for the operation and ownership of radio stations (except for licenses and permits issued by the Federal Communications Commission ("FCC") to the extent it is unlawful to grant a security interest in such licenses and permits).... [Complaint, Exhibit D at 1–2 (Security Agreement).]

Should Arrow default on its obligations under the Agreement, the Agreement gives the Banks the right to proceed against collateral or proceeds from the sale thereof; and to maintain a senior security interest, all subject to applicable law, including the Uniform Commercial Code and the regulations of the FCC. *Id.* at 6–8 (Security Agreement, ¶¶ 10–13). In September, 1989, the Banks filed UCC financing statements in Iowa (and other states) which set forth the Banks' liens on Arrow's FCC radio station licenses.[1]

Dulany is the successor in interest to Gateway Broadcasting Company, which sold two radio stations to a buyer in March, 1985. The purchase price was allocated in part to cash, in part to a $675,000 promissory note ("Gateway Note"). In May, 1986, the buyer assigned her rights and obligations in the radio stations to Marcom of Quad Cities ("Marcom"), an assignment approved by Dulany, as President of Gateway. In September, 1986, Marcom executed two promissory notes in favor of Gateway, in the sum total of $675,000. The notes were signed by Marcom's general partner, Altcom of Quad Cities ("Altcom"), and were guaranteed by Donald Alt, Kerby Confer, and Paul Rothfuss, the principal officers of Altcom and Marcom.

In 1988, Alt and Target Communications of Ohio, Inc., and its affiliated companies ("Target") sold Target's radio stations to Rothfuss (and companies to be incorporated by him, namely Arrow).[2] The station at present known as KMJC–FM was included in the sale. The total purchase price was a sum in cash, and a note to Alt and Target signed and personally guaranteed by Rothfuss for $2,500,000.

In 1989, Arrow began making quarterly payments to Dulany on the Gateway Note, even though no assignment of the Gateway Note appears in the purchase agreement between Alt and Target and Rothfuss (and Arrow). In this connection, it bears noting that the named obligors on the Gateway Note were also the three principals of Arrow. Arrow continued its quarterly payments on the Note until March, 1992. After the obligors' default on the Note, Dulany filed suit in an Iowa state court against Alt, Jerry Cedar, Confer, Rothfuss, Altcom, and Marcom; subsequently, he added to his complaint the original buyer of the radio stations; still later, he named Arrow and the receiver. The receiver removed the case from Clinton County District Court to the United States District Court for the Southern District of Iowa, which dismissed the receiver as a defendant. The receiver seeks an injunction in this court against Dulany's pursuit of his claims against Arrow in Iowa, and an order requiring those claims to be adjudicated in this court. My resolution of Dulany's con-

---

1. Receiver's Application for Authority to Sell Assets of KMJC–FM (Doc. 71) at Exhibit A; Plaintiff's Memorandum in Opposition to Resistance to Sale (Doc. 70) at Exhibit A.

2. The Arrow companies are owned by Rothfuss, Alt, and Confer.

tentions in connection with his claim against the receivership estate will stand as the adjudication the receiver seeks.

The parties dispute no material facts. Instead, they contest two questions of law: whether a creditor can perfect a security interest in a broadcast license or in proceeds from its sale; and whether the Statute of Frauds operates to bar Dulany's claim. Because of my resolution of the first question, I need not consider the parties' arguments about the Statute of Frauds.

## II

In a recent notice of a proposed rulemaking, the FCC has itself summarized its views on security and reversionary interests in broadcast licenses. That summary serves as a useful framework for the issues in this litigation.

> We historically have taken the view that our rule prohibiting sellers from retaining a reversionary interest[3] and our policy prohibiting third party security interests[4] were based upon statutory provisions prohibiting the grant of ownership interests in the spectrum[5] and the assignment by licensees of their interests in a license without prior Commission approval.[6] In a recent case, however, we found that there were no statutory bars in a related context—the sale of a "bare" construction permit for a cellular authorization. *Bill Welch,* 3 FCC Rcd 6502, 6503 (1988). Although we limited *Welch* to the cellular industry, the statutory analysis in that case raises questions as to whether our reverter and security interest policies concerning the broadcast industry are statutorily mandated.[7] According to petitioners and supporting commenters, reversionary and security interests could be viewed merely as rights between private parties that can be exercised only upon Commission approval[8] and, therefore, would be

fully consistent with the provisions of the Communications Act. In light of the analysis in *Welch,* we seek comment on whether the Communications Act prohibits security or reversionary interests in licenses *per se.*

Investment in the Broadcast Industry, 57 Fed.Reg. 14684–01 (April 22, 1992), ¶ 22.

In the course of its summary, the FCC noted a split in opinion among recent federal court bankruptcy decisions about whether creditors can obtain security interests in broadcast licenses. Before discussing these judicial decisions, I will address the sources the FCC cites for its "policy prohibiting third party security interests."

## –A–

*In re Radio KDAN,* 11 FCC 2d 934 (1968), *recons. den.,* 13 RR 2d 100, 12 FCC 2d 1029 (1968), *aff'd on procedural grounds sub nom., W.H. Hansen v. FCC,* 413 F.2d 374 (D.C.Cir.1969), is the *locus classicus* of FCC pronouncements on license security interests. The case arose out of a licensee's attempt to make an assignment which "contemplate[d] little more than the sale of the naked license." This attempt was rebuffed because "Commission policy bars such a sale." 11 FCC 2d at 935. That initial decision by the FCC also treated a more refined issue— reversionary interests in licenses—and in that connection, while noting the issue was moot, the Commission asserted that, "[t]he extraordinary notion that a station license issued by this Commission is a mortgageable chattel in the ordinary commercial sense is untenable."

Although, on reconsideration, the Commission repeated that the petitioner's claim to a reversionary interest was moot, 13 RR 2d at 103, the question was nonetheless taken up more fully. "The reassignment of a broadcast license could not be effected under an

---

3. 47 C.F.R. § 73.1150.

4. *Kirk Merkley,* 94 FCC 2d 829 (1983); *Radio KDAN,* 11 FCC 2d 934, *on recon.,* 13 RR 2d 100, 102 (1968), *aff'd on other grounds sub nom. Hansen v. FCC,* 413 F.2d 374 (D.C.Cir.1969).

5. 47 U.S.C. §§ 301, 304, 309(h)(1).

6. 47 U.S.C. §§ 310(d), 309(h)(2).

7. [Footnote omitted.]

8. *See Commission Policy Regarding the Advancement of Minority Ownership in Broadcasting,* 99 FCC 2d 1249 (1985).

automatic reversion clause whereby, upon default on mortgage payments, the assignor automatically stepped into the shoes of his assignee...." *Id.* at 100. Further, the Commission emphasized that it had "consistently held that a broadcast license (as distinguished from a station's plant or physical assets) may not be hypothecated by way of mortgage, lien, pledge, lease, etc." *Id.* at 102. This policy was said to be founded on the position that "a transferee or assignee (buyer) must be free to dispose of the control of the corporation or the station license without the consent of the seller, or former owners." *Id.* at 103.

*In re Merkley,* 94 FCC 2d 829 (1983), *recons. den.,* 56 RR 2d 413 (1984), *aff'd sub nom. Smith v. Heckler,* 776 F.2d 365 (D.C.Cir.1985), again treated reversionary interests. The Commission cited *KDAN* for the prohibition against reversions, and its refusal to grant licenses "where a former owner or licensee has retained ... a right or power to regain the status of licensee through a reversion of stock control or the reassignment of the station license." 94 FCC 2d at 831 (citation omitted). The Commission summarized its holding as follows:

> While the Commission has a general policy of not questioning the appointment of a receiver or trustee in bankruptcy by state and federal courts [or his request for temporary acquisition of a license], where such an appointment involves the enforcement of a reversionary interest in a broadcast license and the recognition of a security interest in that license by creditors, the application seeking consent to assign the broadcast license to the receiver or trustee is unacceptable for filing. [*Id.* at 829.]

In making this ruling, the Commission reiterated that a broadcast license "is not an owned asset or vested property interest so as to be subject to a mortgage, lien, pledge, attachment, seizure, or similar property right." *Id.* at 830.

The FCC's view that a license "is not an owned asset or vested property interest so as to be subject to a ... lien," as expressed in *KDAN* and *Merkley,* does not decide this case. The reason that is so lies, in part, in the ellipsis in my quotation in the previous sentence. Neither in *KDAN* nor in *Merkley* was the FCC presented squarely with the question whether a license application should be rejected, or a current license revoked, on the sole basis that the licensee had encumbered his license by permitting a creditor to possess a lien on it, or on its proceeds. Plainly, the FCC rulings in those two cases would forbid a licensee from giving a creditor a lien with mortgage rights (such as the right to foreclose and take possession), or a lien with the right to dictate a buyer with whom the licensee must deal. But the FCC has not directly pronounced as to the permissibility of a licensee granting a creditor a bare lien, with no right except to be a secured creditor against any proceeds from a sale of the license—if such a sale occurred. Moreover, as the Commission impliedly acknowledged in its 1992 notice of a proposed rulemaking, the lien policy statements in *Merkley* and *KDAN* are not dictated by the FCC's enabling act. If those statements appeared in a court opinion, they would be treated by judges as dictum; possibly valuable comments, but not binding authority. Indeed, the Commission itself, to judge from its rulemaking summary views in 1992, is no longer sure of its ground on security interests generally.

While the question of the Commission's pronouncements in *Merkley* and *KDAN* on the inefficacy of liens could in another case require a painstaking analysis of problems in federal jurisdiction (treating conflicts among the Bankruptcy Code, policy pronouncements of federal administrative agencies, and state law of secured interests, including state adoption of the Uniform Commercial Code), I do not believe that is necessary or prudent here. The rationale for the Commission's policy against security interests is not implicated by the Banks' lien. This is not a circumstance in which "hypothecation endangers the independence of the licensee who is and who should be at all times responsible for and accountable to the Commission in the exercise of the broadcasting trust." *Merkley,* 94 FCC 2d at 830–31 (citation to *KDAN* and internal quotation marks omitted). Rather, this case falls in with the Commission's emphatic "general policy of not questioning the appointment of a receiver or

trustee in bankruptcy by state and federal courts," or his request for temporary acquisition of a license. *Id.* at 830.

The FCC has approved each change in licensee for KMJC–FM,[9] including the temporary acquisition of the license by the receiver, and his assignment of the license to Signal Hill Communications, Inc., the transaction which put the issues raised by Dulany into a litigable context. In responding to Dulany's informal objection to the assignment, the FCC ruled that:

> The matters raised in Dulany's objection relate to a private contractual dispute involving a debt owed to Dulany. The Commission has consistently held that private disputes are beyond our regulatory jurisdiction and must be resolved in a local court of competent jurisdiction. *See John R. Kingsbery,* 71 FCC 2d 1173 (1979); *John F. Runner, Receiver (KBIF),* 36 RR 2d 773 (1976); *Transcontinental Television Corp.,* 44 FCC 2451, 2461 (1961). The Commission believes that a fair accommodation must be reached between its exclusive authority over licensing matters and the authority of state and local courts in adjudicating private contractual disputes. The Commission does not possess the resources, expertise, or jurisdiction to adjudicate such issues and will defer determinations regarding the interpretation and enforcement of contracts for the sale of broadcast stations to state and local courts. (Citation omitted.) [In re: KMJC–FM, Clinton, Iowa, Assignment of License, File No. BALH–921008HF (letter ruling, February 25, 1993).]

The FCC's general policy against security interests, if taken strictly to include a prohibition against all liens against licenses, would conflict with the "Commission's longstanding policy of refusing to adjudicate private law issues." *Id.* The FCC has expressly declined to find such a conflict in this case, and I decline to manufacture one.

The Commission's policy against adjudicating private law issues properly belonging to courts is the basis for many FCC decisions, just as it is the basis for its rejection of Dulany's petition concerning KMJC–FM. The Commission's policy against liens only arises in the context of its prohibition against reversionary interests generally. The policy against liens has never itself been the basis of an FCC ruling. For example, in this case, if Arrow, in giving the Banks a lien against the proceeds of their licenses, had encumbered its KMJC license in a manner strictly prohibited by the FCC, that would raise substantial questions about the assignment of that license to the receiver, and its eventual transfer to Signal Hill. Yet those questions were never raised by any party in the course of the license's transfers. Nor, even when, through Dulany's petition, its attention has been drawn to the Banks' lien, has the FCC commented on these points. The briefing of the parties and the court's own researches have not disclosed a single case in which the FCC has ruled such "bare" liens prohibited the transfer, assignment, or holding of a radio broadcast license. Further, the Commission has expressly declined to enter disputes about creditors' rights in license proceeds.

There is no conflict here between Commission policies. To the extent the Commission's general pronouncements about security interests conflict with its refusal in specific cases, including the present matter, to entertain disputes about various secured interests not directly implicating licensing, I defer to the FCC's specific refusal to settle private law matters. If the Commission considered that permitting state and federal courts to adjudicate those private law matters would be disruptive to its legitimate authority, then presumably its policy would be different. But, as in the present case, it is plain that the Commission's guiding policy in licensing and security interests is to prohibit only certain forms of third party interference between the licensee and the FCC. "The Commission has established certain public interest limitations on a licensee's contractual authority and imposes these limits by withholding its approval of a pending assignment application." *Merkley,* 94 FCC 2d at 838. (Those limits, as I have noted, concern chief-

---

9. "KMJC–FM" includes predecessor stations owned by the original buyer and her successors, using the same frequency, but with different call letters.

ly security interests that are reversionary or prescriptive.) Here, the FCC has approved assignment of the KMJC–FM license from Arrow to the receiver, and its transfer by the receiver to Signal Hill, clearly implying that the Banks' lien on the license was not the sort of contractual agreement precluded by the public interest.

To the degree the decisions in *KDAN* and *Merkley* not only forbade reversionary interests in licenses, but went on to consider and pronounce on questions not directly presented, for example suggesting that reversionary interests fell into the general category of security interests in licenses—all of which (including liens) were prohibited—, the basis for that general analysis and reasoning has been called into question by *Bill Welch*, as the FCC has itself acknowledged in its ongoing rulemaking. Moreover, the degree to which the FCC's pronouncements on security interests generally ought to be disregarded or abandoned [10] may most helpfully be considered in relation to the cases to which the FCC has drawn attention as illustrating the divergence in opinion among federal courts. Consequently, I now turn to consideration of relevant judicial decisions.

–B–

A conflict has recently arisen among the federal courts in other circuits over the issue of the validity of broadcast license liens. Having reviewed that dispute, I see no reason to depart from venerable precedent in the First Circuit which finds liens such as those involved in this case valid and enforceable.

In *In re Tak Communications, Inc,* 138 B.R. 568 (W.D.Wis.1992), *aff'd,* 985 F.2d 916 (7th Cir.1993) (concluding "the district court's reasoning was correct in all respects"), the Seventh Circuit declined to affirm the validity of bank liens on broadcasting licenses. The district court held that the bankruptcy judge was correct in finding that the FCC's policy prohibiting security interests in licenses preempts state law. The district court, citing *KDAN* and *Merkley,* also styled its holding broadly, and stated that the FCC not only prohibited the liens at issue in *Tak,* but liens as a form of security interests generally. The liens the banks held against Tak's stations, however, were of the sort specifically prohibited in *KDAN* and *Merkley.* That is, they were not liens merely against the proceeds of the licensee's use of the license, or the licensee's transfer of his rights. Instead, the liens gave the banks the right "to take possession of the collateral," including the licenses; and the banks "initiated an adversary proceeding in the bankruptcy court seeking to declare the validity of their liens on Tak's rights under the FCC licenses." 138 B.R. at 570. The banks sought a declaratory judgment that they held a perfected interest in "Tak's *right* to sell the station as a going concern." *Id.* at 571 (emphasis added). These claims by the banks, of course, squarely interfered with the FCC's regulation of its licensee,[11] and conflicted with the FCC's policy that the licensee must be able to transfer his license freely.[12]

I find the *Tak* opinions overbroad insofar as they purport to forbid all liens on broadcasting licenses. *Tak* also highlights a fundamental problem in general pronouncements forbidding liens. Such pronouncements create an inherent contradiction. If, as the *Tak* courts assert, radio licenses are not property, and if licensees have no property interest in them, how then can a license be

---

**10.** When presented in this case with evidence that a licensee permitted a lien on proceeds of its license, the FCC declined to pronounce the liens prohibited, or the licensee adversely affected. The Commission's distrust of such liens gave way to its policy of permitting state and federal courts to adjudicate private law matters, such as creditors rights in proceeds held by a receiver. This case then provides some evidence that the FCC's dislike of such liens is a preference, not a policy.

**11.** The *Tak* court notes that "a contractual right to a public sale of a station and a right to compel a party to file an application with the FCC [both

permitted by the Commission] are different from a contractual right to treat an FCC license as collateral." 138 B.R. at 574. On their face, however, these two "different" rights seem to interfere *more* with the FCC's plenary licensing authority, and its relation to its licensees, than do "bare" liens.

**12.** *See In re Jewel F. Smith,* 94 B.R. 220 (Bankr. D.Ga.1988) (holding FCC license part of bankrupt's estate; but denying creditor's lien when lien meant to establish creditor's right to abrogate licensee's power freely to transfer license).

part of an estate in bankruptcy, or under the administration of a receiver, both procedures the FCC specifically endorses? The answer is suggested by a decision from the Fourth Circuit, *In re Ridgely Communications, Inc.*, 139 B.R. 374, 379 (Bkrtcy.D.Md.1992).

The bankruptcy judge in *Ridgely* held that a broadcast license is property within the Bankruptcy Code's definition of the debtor's estate; and that creditors may hold liens in broadcast licenses, restricted "to the extent of the licensee's proprietary rights in the license vis-a-vis private third parties," and with no right of foreclosure. While the *Ridgely* court disagreed generally with the reasoning in *Tak*, it also noted the circumstances of the cases were different. "The decision [in *Tak* ] was not rendered in relation to a distribution of proceeds arising from a sale of a broadcasting license as a going concern approved by the FCC," *id.* at 380, the type of distribution obtained in *Ridgely* and anticipated in the instant case.

The *Ridgely* court noted that it is settled that broadcasting licenses may be treated as part of estates in bankruptcy, because they are property as defined in section 541 of the Bankruptcy Code. *Id.* at 377–78. *See In the Matter of Fugazy Express, Inc.*, 114 B.R. 865 (Bankr.S.D.N.Y.1990), *aff'd*, 124 B.R. 426 (S.D.N.Y.1991). "To hold otherwise would be to rule ... that a property interest subject to regulation, as nearly all are, or conditioned upon regulatory requirements, is not property of an estate. Such a ruling would contemplate that all licenses and permits issued by governmental units are not property of the estate...." *In re Beker Indus. Corp.*, 57 B.R. 611, 622 (Bankr.S.D.N.Y.1986) (holding trucking license granted by administrative agency part of bankruptcy estate), *rev'd, in part, on other grounds*, 89 B.R. 336 (S.D.N.Y.1988).[13] *But see, In re D.H. Overmyer Telecasting Co.*, 35 B.R. 400 (Bankr. N.D.Ohio 1983) (FCC license not property of the bankruptcy estate); *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983) (airplane landing slots neither licenses nor property rights).[14] And as noted above, the FCC

itself is content to have broadcast licenses considered properly part of bankruptcy estates and within the administration of court-appointed receivers; indeed, the FCC has acted on that premise in the present case.

Moreover, as the *Ridgely* court observed, while the FCC stated in *Merkley* that a broadcasting license is not a vested property interest subject to a lien, and that a licensee has no property interest in its license, in *Bill Welch*, 3 FCC Rcd. 6502 (1988), the FCC reversed its position on the meaning of 47 U.S.C. §§ 301 and 304, the basis for its prior decisions. In *Welch*, the Commission acknowledged that a licensee has a limited property interest in a cellular broadcasting license; and that the licensee is privileged to sell the "bare" license to a buyer for profit. The Commission determined that sections 301 and 304 only forbade the licensee from asserting property rights in a license against the federal government; to that extent the licensee did have limited property rights in the license in relation to third parties, and the license could be sold by the licensee, subject to Commission approval.

In an opinion issued almost a century ago, the First Circuit provided persuasive reasoning on many of the issues presented in the present case. *Fisher v. Cushman*, 103 F. 860 (1st Cir.1900), examined whether a bankrupt could be required to turn in a liquor license to a bankruptcy receiver. The court held that "the mere license represents a police regulation, so that, ... even though given for a fixed period, it may be revoked without compensation by legislation touching the public interests[;] because it represents no vested right, it is not possible to regard it as property of itself." *Id.* at 865 (citation omitted). (Thus far, this is the logic of the FCC, and of every court treating broadcasting licenses.) However, "the pecuniary interest or capital which this license represents, and which may customarily be made available, is property which the bankrupt is bound to assist in realizing for his credi-

---

**13.** See also cases cited *infra* at 48–49.

**14.** The First Circuit in *In re Gull Air*, 890 F.2d 1255, 1260 (1st Cir.1989), rejected the Fifth Cir-

cuit's reasoning in *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983), in part due to superseding FAA policies.

tors...." *Id.* It is "property, within the meaning of the bankrupt act." *Id.* at 866.

What the First Circuit observed in *Fisher* is that "it is impossible to give any categorical definition of the word 'property,' or to give such specific limitation to it as would always determine its relations to any particular statute." *Id.* The First Circuit's functional approach to defining property anticipated by a full generation the Legal Realist's critique of what they took to be the then still dominant mode of abstract, conceptual legal thinking. In "Property and Sovereignty," 13 Cornell L.Q. 8, 12 (1927), the philosopher Morris Cohen emphasized that "[w]hatever technical definition of property we may prefer, we must recognize that a property right is a relation not between an owner and a thing, but between the owner and other individuals in reference to things." I need not reject any of the FCC's definitions of the property rights licensees have in their licenses; I need only recognize that the FCC's definitions apply first to the licensee's property interests in relation to the FCC.[15] Before I import those definitions into other contexts, for example into the bankruptcy code, and debtors rights against the trustee, however, careful scrutiny is necessary.

I decline to adopt the holding of the *Tak* court in so far as it applies FCC strictures on security interests—deriving from the FCC's discharge of its regulatory duties—to different contexts shaped by different laws and statutory schemes. As the First Circuit noted in *Fisher*, the nineteenth century stock exchange seat cases settled one question, "and that is that the fact that transferability depends on the consent of a stranger does not defeat the claim of creditors in bankruptcy to realize what can be obtained if transfer is made." 103 F. at 863. "[E]very license, however obtained, has a recognized value ... in excess of the governmental fee, and ... the amount of that excess may represent actual cash of its holder paid for on its

transfer from some other licensee. Thus, it represents capital." *Id.* at 864. Creditors, the *Fisher* court held, may intervene in disputes over such funds. "We do not understand that the objection as to [the creditor] is now insisted upon, but, even if it were, it would be fruitless, because the rule is settled beyond all doubt that any person claiming an equitable or legal interest in a fund in the registry of the court is entitled to intervene in that behalf." *Id.* at 867.

The logic of the various elements of the First Circuit's holding in *Fisher* have recently been reaffirmed. *See In re Gull Air, Inc.,* 890 F.2d 1255, 1260 (1st Cir.1989) (holding that "FAA grants to carriers a limited proprietary interest in [landing] slots," despite FAA provision that "[s]lots do not represent a property right but represent an operating privilege subject to absolute FAA control"); *In re Genuario,* 109 B.R. 550 (Bankr.D.R.I. 1989) (creditor may perfect security interest in bankrupt's liquor license); *In re WHET, Inc.,* 33 B.R. 424, 439 (Bankr.D.Mass.1983) (bankruptcy trustee may order sale of radio station as part of bankrupt's estate).

The Banks have a secured right to remuneration from the proceeds of the transfer of Arrow's broadcasting license by the receiver to Signal Hill. Under the Uniform Commercial Code, § 9–106, a governmental license is a "general intangible," defined as "any personal property, including things in action, other than goods, accounts, chattel paper, documents, instruments and money." Proceeds from the sale of a general intangible are proceeds in which a creditor can perfect a security interest; and the Banks have so perfected their interest in the proceeds of the transfer of the KMJC–FM license, held among the assets of the receivership. *See, e.g., Ridgely* (debtor's broadcast license is general intangible; creditor can perfect security interest in proceeds of its transfer); *In re Genuario,* 109 B.R. 550 (Bankr.D.R.I. 1989) (liquor license is general intangible);

---

**15.** My holding is consistent with the FCC's rule providing that a transferor of a broadcast license may retain "no right of reversion of the license, no right to reassignment of the license in the future, and may not reserve the right to use the facilities of the station for any period whatsoever." 47 C.F.R. § 73.1150(a). This rule reflects the FCC's chief concern (the same concern it addresses in its pronouncements on security interests): that it has regulatory authority over the holding and transfer of licenses. That FCC regulatory authority is not implicated in the present case.

*Freightliner Market Development Corp. v. Silver Wheel Freightlines, Inc.,* 823 F.2d 362 (9th Cir.1987) (holding state and federal transport operating licenses to be general intangibles); *In re Cleveland Freight Lines, Inc.,* 14 B.R. 777, 779–80 (Bankr.N.D.Ohio 1981) (ICC certificates of public convenience and necessity are "revocable licenses that confer no property rights upon [their] holders," but certificates are general intangibles and security interests may be held in the proceeds of their sales). *But see In re Oklahoma City Broadcasting Corp.,* 112 B.R. 425 (Bankr.W.D.Okla.1990) (FCC license not general intangible under UCC). Consequently, I hold that the Banks' secured interest in the general intangibles of the Arrow stations, including the license, is superior to the unsecured interest of Dulany when proceeds are distributed.

### III

For reasons set forth more fully above, I conclude that Dulany's unsecured claim to the proceeds of the sale of any Arrow broadcast station, including the license, is subordinate to the Banks' secured claims to those proceeds.