In re **CENTRAL ARKANSAS BROAD-CASTING COMPANY, INC.,** Debtor.

**Bankruptcy No. 88–42189M.**

United States Bankruptcy Court, E.D. Arkansas, Western Division.

March 30, 1994.

**144**

Dale W. Finley, Russellville, AR, for First State Bank and Ward Ramsey.

James F. Dowden, Trustee, Little Rock, AR.

David A. Grace, Little Rock, AR, for Debtor.

## ORDER

JAMES G. MIXON, Chief Judge.

On October 31, 1988, Central Arkansas Broadcasting Company, Inc. (debtor) filed a voluntary petition for relief under the provisions of Chapter 11 of the United States Bankruptcy Code. The case was converted to Chapter 7 and James F. Dowden was appointed trustee. On December 11, 1991, the trustee filed a motion for authority to sell assets of the estate at public auction. Among the assets the trustee intended to sell were "all inventory, fixtures, equipment and all other tangible and intangible assets of Central Arkansas Broadcasting Company, Inc." and "the call letters KWKK and KCAB and the goodwill of Central Arkansas Broadcasting, Inc."

On January 3, 1992, the assets were sold at a public auction to Ward Ramsey for a purchase price of $100,000.00, and on January 28, 1992, an order was entered approving the sale of the assets. As part of the sale to Ramsey, the operating license for the radio station was transferred to Ramsey with the approval of the Federal Communications Commission (FCC).

First Bank of Arkansas (the "Bank") claims a security interest in the $95,000.00 of the sale proceeds. On August 28, 1992, the trustee objected to the Bank's claim. Neither party disputes that First Bank of Arkansas (Bank) holds a perfected security interest in all the tangible assets sold by the trustee, with the exception of the realty. The parties stipulate that the realty has a fair market value of $5,000.00. In addition, the parties stipulate and case law supports the proposition that a broadcasting license is not a property right that may be encumbered with a security interest. *See In re Tak Communications, Inc.,* 985 F.2d 916, 918 (7th Cir.1993); *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir.1986). The Bank does not claim a security interest in any other intangible property.

The trustee argues that the fair market value of the tangible assets sold is $30,000.00 and the balance of the purchase price represents the value of the intangible property sold, including the broadcasting license and goodwill of the radio station. The Bank argues that the broadcasting license is not property of the estate and that $95,000.00 of the sale proceeds should be allocated to the equipment in which the Bank holds a perfected security interest.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) (1988), and the Court has jurisdiction to enter a final judgment in the case.

## I

### Is the Broadcasting License Property of the Estate?

■ Section 541(a)(1) defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1988). The bankruptcy estate consists of all property of the debtor including not only tangible property, but also intangible property. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983).

■ Section 541(c)(1)(A) provides that property of the estate includes the debtor's interest in property:

notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

(A) that restricts or conditions transfer of such interest by the debtor.

11 U.S.C. § 541(c)(1)(A) (1988). Property of the estate includes intangible property such as licenses and business goodwill. *See Shimer v. Fugazy (In re Fugazy)*, 114 B.R. 865, 871 (Bankr.S.D.N.Y.1990), *aff'd*, 124 B.R. 426 (S.D.N.Y.1991); *In re Smith*, 94 B.R. 220, 221 (Bankr.M.D.Ga.1988); 4 *Collier on Bankruptcy* ¶ 541.09[5] (Lawrence P. King ed., 15th ed. 1993).

The Bank relies on the cases of *D.H. Overmyer Telecasting Co., Inc. v. Lake Erie Communications, Inc. (In re D.H. Overmyer Telecasting Co., Inc.)*, 35 B.R. 400 (Bankr. N.D.Ohio 1983) and *American Cent. Airlines, Inc. v. O'Hare Regional Carrier Scheduling Comm. (In re American Cent. Airlines, Inc.)*, 52 B.R. 567 (Bankr.N.D.Iowa 1985) to support its argument that the broadcasting license is not property of the estate.

The Bank cites *Overmyer* for the proposition that a broadcasting license is not property of the estate because it is not a property right. The court in *Overmyer* stated that a broadcasting "license is not 'property of the estate,' as commonly defined," but then added that a "broadcasting license is a property right only in a limited sense." *Overmyer*, 35 B.R. at 401. The court held that a broadcasting license is not property of the estate

for purposes of granting injunctive relief to the debtor to prohibit the FCC from revoking the debtor's license and issuing a new license to a third party. *Overmyer*, 35 B.R. at 403.

In *Beker Indus. Corp. v. Florida Land & Water Adjudicatory Comm. (In re Beker Indus. Corp.)*, 57 B.R. 611, 622 (Bankr. S.D.N.Y.1986), the court rejected the rationale of *Overmyer*, stating:

[*Overmyer* ] fail[s] to consider either the legislative history to § 541 of the Code which defines property of the estate or *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983), where the Supreme Court, upon examination of that history, observed that "Congress intended a broad range of property to be included in the estate." Following *Whiting Pools* and relying on it, the district court in *Bernstein v. R.C. Williams, Inc. (In re Rocky Mountain Trucking Co.)*, 47 B.R. 1020 (D.Colo. 1985) held that a state agency issued certificate of public convenience and necessity enabling a trucking firm to serve as a common carrier throughout the state is property of the estate, even though dormant pursuant to agency rules, and therefore consideration by the commission of post-petition failure to utilize the license was within the automatic stay provided by § 362(3) of the Code. Other courts are in accord in holding similar permits to be property of an estate. *See e.g., In re Golden Plan of California, Inc.*, 37 B.R. 167 (Bankr.E.D.Cal.1983); *In re Hodges*, 33 B.R. 51 (Bankr.E.D.Pa.1984); *In re R.S. Pinellas Motel Partnership*, 2 B.R. 113, 5 B.C.D. 1292, 1 C.B.C.2d 349 (Bankr. M.D.Fla.1979).

*Beker*, 57 B.R. at 622.

The second case the Bank relies upon, *American Cent. Airlines, Inc. v. O'Hare Regional Carrier Scheduling Comm. (In re American Cent. Airlines, Inc.)*, 52 B.R. at 567, does not support the Bank's argument. *American Cent. Airlines* involved the issue of whether landing slots at Chicago O'Hare airport constitute property of the estate. Judge Stageman expressly held that:

Although the FAA may remove a slot at any time, until such action is taken, the holder has a possessory interest in a slot at the given airport. Such a possessory interest must constitute property of the estate. The mere fact that an interest exists by the grace of government no longer precludes the interest from being treated as a property right.

*American Cent. Airlines,* 52 B.R. at 571 (citations omitted).

The rationale of the cases supporting a finding that broadcasting licenses are property of the estate is more persuasive. Although federal regulations do not allow the debtor to own the broadcasting license,[1] it still has considerable value to the debtor because the license can be transferred to a third party, subject to the FCC's approval. This is best illustrated by the fact that the debtor in this case, with the FCC's approval, has transferred its broadcasting license to Ramsey. In fact, the debtor's own expert implied that the broadcasting license had some value, although he stated that he could not determine the value of the right to broadcast on a particular frequency in a particular market. Therefore, the Court finds that the broadcasting license is valuable intangible property of the debtor's estate.

## II

### *Proper Allocation of Property Value*

■ The parties have submitted the depositions of three experts on the issue of the proper allocation of the purchase price between the tangible and intangible property. Although the Bank contends that the property sold contained no intangible property, its own expert, Dewey Johnson, valued the tangible property sold at approximately $77,000.00. Johnson testified that his valuations were based on the price a willing purchaser would pay for the equipment in an arm's length transaction.

Johnson is familiar with the property due to an agreement he entered with Ramsey that involves "a monthly fee to Ramsey Communications [and] an option to purchase or gain assignment of the licenses." Johnson's

Dep. at 36. When asked if he could assign a value to the alleged goodwill sold by the trustee or to the right to broadcast, Johnson replied, "That's very tough to answer. I don't know that I have an answer for that." Johnson's Dep. at 34.

Ralph Walsh, one of the trustee's expert witnesses, valued the equipment at $30,000.00, based on "an equivalent value or a current day price," which he discounted by a rate of thirty to fifty percent for depreciation. Walsh's Dep. at 13. He also testified that, "The true value of a broadcast station is the license, not the equipment." Walsh's Dep. at 10. Walsh testified further as follows:

Q: Going back to our hypothetical this $100,000 price for the assets and the opportunity to operate the license of these two radio stations. Based on your experience, do you believe that it's safe to assume that the $100,000 price was primarily paid for the opportunity to operate those stations under the existing authority with the FCC, except perhaps for this $30,000 or so that you—

A: That's the only rational reason that there is for paying over asset value of anything, is a license to operate.

Walsh's Dep. at 22–23.

David Morrison, another expert witness who testified on behalf of the trustee, valued the equipment at $25,000.00. Morrison testified that he is very familiar with the equipment sold by the trustee because he worked as operations manager at KCAB for a period of eight months, shortly before the debtor filed bankruptcy. Morrison testified that, at the time he left KCAB in 1988, the general condition of the equipment was poor. Morrison gave the following testimony regarding the fair market value the equipment:

A: Well, from the time that I was first contacted by this law office regarding this, it's given me an ample amount of time to think about the equipment that was there and go over it in my mind. The one piece of equipment

---

**1.** *See* 47 U.S.C. § 301 (Supp. III 1991).

that I can think of that really had any value would be the AM tower. The rest of that equipment, as far as I'm concerned, is salvage or darn close to it. There are isolated instances where it wouldn't be, because there is value to some of it, market value. But the majority there is not. To pin me down to an exact penny figure, I can't do that. If I were going to make an offer on that equipment today, I would not give an offer of over $25,000 for the whole total lump sum of all the broadcast equipment that was there.

Q: I want you to assume for a moment that a person paid $100,000 for this equipment, and for the right to broadcast on that frequency and for the license of the station. How would you allocate what he paid, what a person in that position paid for each of those items that he bought?

A: ... The potential of a market determines more the value of a radio station than any broadcast equipment that you can put in there. Any time you buy a radio station you're buying blue sky, a great deal of it is blue sky, and what you feel like the potential of that market is, and how you can develop that market from advertising sales. Russellville has historically been a pretty good radio advertising market. Knowing the value of that equipment and so forth, if I were breaking it out, the value of that license, if I were just going to buy that license, the license would be worth $100,000 to me, and the equipment would be worth virtually nothing, because I could go to a leasing company and put in all new equipment and generate a much better sound than I could by starting off trying to use the old equipment. I virtually would give you nothing for that equipment. I wouldn't want it.

Morrison's Dep. at 10–12.

After considering all of the evidence submitted by the parties, the evidence is more convincing that the value of the equipment sold by the trustee is $35,000.00. Since the realty was stipulated by the parties to have a value of $5,000.00, the balance of the sale proceeds, $60,000.00, is determined to be the value of the intangible assets sold by the trustee. Therefore, the trustee's objection to the Bank's claim is sustained, and the trustee is ordered to disburse to First Bank of Arkansas the sum of $35,000.00. The balance of the sale proceeds shall be retained by the trustee to be distributed to creditors upon further orders of the Court.

IT IS SO ORDERED.