## In re RIDGELY COMMUNICATIONS, INC., Debtor.

### Bankruptcy No. 89–5–1705–JS.

United States Bankruptcy Court, D. Maryland.

April 15, 1992.

F. Thomas Rafferty, Blum, Yumkas, Mailman, Gutman & Denick, P.A., Baltimore, Md., for debtor.

Lewis S. Goodman and Linda V. Donhauser, Miles & Stockbridge, Baltimore, Md., for Ameritrust Co. Nat. Ass'n.

Edmund A. Goldberg, Office of the U.S. Trustee, Baltimore, Md.

## MEMORANDUM OPINION GRANTING MOTION OF AMERITRUST COMPANY N.A. TO DISTRIBUTE PROCEEDS FROM SALE OF BROADCASTING LICENSES

JAMES F. SCHNEIDER, Bankruptcy Judge.

### FINDINGS OF FACT

1. The instant voluntary Chapter 11 bankruptcy petition was filed in this Court on May 23, 1989. The debtor is engaged in the business of owning and operating two radio stations, WVOC–AM and WCEZ–FM, which are located in Columbia, South Carolina.

2. On October 4, 1990, this Court authorized the sale of the two radio stations to Clayton Radio, Inc. for a total purchase price of $2,550,000.00. The net proceeds from the sale totalled $2,473,286.91.

3. The sale included all of the debtor's assets, including the broadcasting licenses for WVOC–AM and WCEZ–FM.

4. The sale of the assets was free and clear of all liens, with any liens attaching to the sale proceeds.

5. On December 5, 1990, the sale to Clayton Radio, Inc. took place, and the closing documents and sale proceeds were escrowed pending final approval of the sale by the Federal Communications commission ["F.C.C."].

6. Thereafter, the sale to Clayton Radio, Inc. was approved by the F.C.C.

7. Ameritrust Company National Association, as a fully secured creditor of the debtor, holds a first priority lien against all the debtor's tangible and intangible property. The claim of Ameritrust totalled over $4.3 million.

8. On April 19, 1991, Ameritrust filed the instant motion to distribute the net proceeds [P. 189], in which Ameritrust claimed a balance in the approximate amount of $2 million after payment of certain priority and administrative claims.

9. The debtor filed a partial objection [P. 195] on May 13, 1991. Among the grounds set forth in support of the objection by the debtor were the following assertions:

> [3.] Under the Federal Communications Law and its own loan documents, Ameritrust's claim to a lien does *not* extend to the proceeds of the two radio stations licenses
>
> .     .     .     .     .
>
> [6.] In a distress sale such as this one, the tangible assets should arguably

be credited with only their liquidation values.... Under any plausible allocation mechanism, there exists substantial proceeds from the unencumberable federal broadcast licenses for administrative payment to unsecured creditors in the Ridgely Communications, Inc. bankruptcy case.

Debtor's Response and Partial Objection [P. 195].

10. On May 24, 1991, the debtor filed a motion to value collateral [P. 200] pursuant to Section 506 of the Bankruptcy Code, by which it asserted that the secured claim of Ameritrust did not extend to the broadcasting licenses and that therefore its claim to proceeds from the sale of the stations should be limited to those funds attributable to only the "hard assets" of the two radio stations, exclusive of the licenses. The debtor further contended that because the sale to Clayton Radio, Inc., was a distress sale, the Court should utilize a liquidation valuation to determine that Ameritrust receive only $750,000 of the sale proceeds attributable to the stations' "hard assets."

11. At a hearing held on November 8, 1991, this Court overruled the debtor's objection, denied the debtor's motion to value collateral and granted Ameritrust's motion to distribute sale proceeds, based upon the following analysis.

## CONCLUSIONS OF LAW

1. The issue in this case is whether a creditor may perfect a security interest in an F.C.C. broadcasting license to the extent that the creditor may enforce a claim to proceeds resulting from a sale of the license by a debtor in bankruptcy.

■ 2. The broadcasting licenses granted to the debtor prepetition by the F.C.C.

became property of the bankruptcy estate when the instant Chapter 11 petition was filed, pursuant to the broad definition of property of the estate contained in Section 541 of the Bankruptcy Code. *In the Matter of Fugazy Express, Inc.,* 114 B.R. 865 (Bankr.S.D.N.Y.1990), *aff'd* 124 B.R. 426 (S.D.N.Y.1991). This conclusion seems to have been implicitly acknowledged by the debtor, which only objected to the disbursement of sale proceeds from the licenses to Ameritrust, but not to the disbursement of proceeds to the unsecured creditors.

■ 3. The general policy of the F.C.C. is that a lender/creditor may not perfect a security interest in a broadcast license. This policy has been enunciated in several F.C.C. decisions, more recently in the case of *In re Merkley,* 94 F.C.C.2d 829 (1983). In *Merkley,* the F.C.C. reiterated its long-standing position that "a broadcast license, as distinguished from the station's plant or physical assets, is not an owned asset or vested property interest so as to be subject to a mortgage, lien, pledge, attachment, seizure, or similar property right." *Id.* at 830–31 (Citations omitted). The rationale for this policy is that "such hypothecation endangers the independence of the licensee who is and who should be at all times responsible for and accountable to the Commission in the exercise of the broadcasting trust."[1] *Id.*

4. However, the F.C.C. *has* recognized that a licensee possesses *some* property interest, *albeit limited,* in the broadcasting license. In the case of *In re Bill Welch,* 3 F.C.C.R. 6502 (1988), the Commission permitted the for-profit sale of a "bare" F.C.C. authorization for unbuilt facilities. The Commission had previously interpreted Sections 301 and 304 of the Communications Act,[2] 47 U.S.C. §§ 301 & 304, to require

---

1. The F.C.C. has adopted a rule, similar to the proscription against security interests, which provides that a transferor of a broadcast license may retain "no right of reversion of the license, no right to reassignment of the license in the future, and may not reserve the right to use the facilities of the station for any period whatsoever." 47 C.F.R. § 73.1150(a). The rule is another indication of the F.C.C.'s primary concern with preserving its regulatory authority over

licensees and over the transfer of broadcast licenses.

2. Section 301 provides in pertinent part:
It is the purpose of this Act, among other things, to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no

that a broadcast license convey no property interest to the licensee and that a "bare" sale violated the provisions of the Act by recognizing a valuable property interest in the license itself. However, in *Bill Welch,* the Commission reversed this position and reinterpreted Sections 301 and 304. After analyzing the legislative history of the Act, the Commission reasoned that the Act only addressed the concern that licensees might attempt to assert property rights in the actual broadcast frequencies themselves *as against the Federal government.* The Commission acknowledged that a license confers certain private rights upon the licensee and that these rights may be sold for profit to a private party, subject to Commission approval. The Commission recognized that rights between licensees and the Commission are to be distinguished from rights between the licensee and a private third party. It is this distinction that permits a licensee to receive a profit from the transfer of a license to third party.

5. That a broadcast license confers certain proprietary rights has also been recognized in the bankruptcy context. *Matter of Fugazy Express, Inc., supra,* held that a broadcast license became property of the estate upon the filing of a bankruptcy petition and that the F.C.C. could not cancel the license without first obtaining relief from the automatic stay. 114 B.R. at 873.

6. In *Fugazy, supra,* Judge Lifland discounted the weight of two contrary decisions, *In re D.H. Overmyer Telecasting Co.,* 35 B.R. 400 (Bankr.N.D.Ohio 1983) and *In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir.1983):

> ... The court in *Overmyer* held that the debtor's FCC license was not property of the estate as commonly defined, due to the fact that the FCC retained continuing and exclusive jurisdiction over any subsequent transfer of the license by

the debtor. *Id.* at 401. Defendants also cite *In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir.1983), which held that the debtor's airport landing slots were neither licenses nor property rights, but instead were Federal Aviation rules which imposed restrictions on the use of the debtor airline's property, its airplanes.

However, the rationale of both the *Overmyer* and *Braniff* cases was rejected by this district in the well reasoned opinion *In re Beker Indus. Corp.,* 57 B.R. 611 (Bankr.S.D.N.Y.1986). In *Beker,* the court found that the debtor's ability to truck phosphate ore on public roads pursuant to an administrative agency's order was a license so as to be property of the estate within the meaning of § 541, stating that:

> Both of these cases [*Overmyer* and *Braniff*] failed to consider either the legislative history to § 541 of the Code which defines property of an estate or *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 79 L.Ed.2d 515 (1983), where the Supreme Court, upon examination of that history, observed that "Congress intended a broad range of property to be included in the estate". Following *Whiting Pools* and relying on it, the district court in *Bernstein v. R.C. Williams, Inc. (In re Rocky Mountain Trucking Co.),* 47 B.R. 1020 (D.Colo. 1985) held that a state agency issued certificate of public convenience and necessity enabling a trucking firm to serve as a common carrier throughout the state is property of the estate, even though dormant pursuant to agency rules, and therefore consideration by the commission of post-petition failure to utilize the license was within the automatic stay provided by § 362(a)(3) of the Code. Other courts are in accord in holding similar permits

---

such license shall be construed to create any right, beyond the terms, conditions, and periods of the license.
47 U.S.C. § 301 (1988).
Section 304 of the Act provides:
No station license shall be granted by the Commission until the applicant therefor shall

have signed a waiver of any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise.
47 U.S.C. § 304 (1988).

to be property of an estate. *See e.g., In re Golden Plan of California, Inc.,* 37 B.R. 167 (Bankr.E.D.Cal.1984); *In re Hodges,* 33 B.R. 51 (Bankr.E.D.Pa. 1983); *In re R.S. Pinellas Motel Partnership,* 2 B.R. 113, 5 B.C.D. 1292, 1 C.B.C.2d 349 (Bankr.M.D.Fla.1979).

*In re Beker Indus. Corp.,* 57 B.R. at 622.

Further, the court in *Beker* specifically rejected the proposition that the mere existence of state or federal regulation precludes property rights from coming within the wide horizon of property of the bankruptcy estate by ruling that:

> To hold otherwise would be to rule ... that a property interest subject to regulation, as nearly all are, or conditioned upon regulatory requirements, is not property of an estate. Such a ruling would contemplate that all licenses and permits issued by governmental units are not property of the estate....

> Far more consistent with general Congressional intent as found by *Whiting Pools* is to construe such rights as within the definition of property of an estate, to recognize, as discussed *infra*, that valid regulation continues post-petition as provided in 28 U.S.C. § 959(b) (1978) and to apply the evident Congressional intent, reflected in §§ 362(b)(4) and (b)(5) of the Code that good faith enforcement by governmental units of valid regulation is to be permitted to continue. *Id.* 57 B.R. at 622.

114 B.R. at 870.

7. The case of *In re Jewel F. Smith,* 94 B.R. 220 (Bankr.D.Ga.1988), recognized that a broadcast license was property within the context of the Bankruptcy Code and that it became property of the estate upon the filing of the bankruptcy petition. However, the court in *Smith* went on to hold that a creditor could not take a security interest in the debtor's broadcast license. The creditor had filed an objection to the trustee's proposed assignment of the broadcast license, claiming that it was subject to the creditor's perfected first lien security interest in the license. The creditor argued that a security interest may be taken in a license and that the creditor may

foreclose on the license after receiving permission from the F.C.C. The court, relying upon *In re Merkley, supra,* held that a security interest may not be taken in a broadcast license. The court also cited with approval *Stephens Industries, Inc. v. McClung,* 789 F.2d 386 (6th Cir.1986). In *Stephens Industries,* the Sixth Circuit Court of Appeals cited in *dicta* and without comment, but apparently with approval, the language of *Merkley.* However, the *Stephens* court was not addressing the issue of whether a creditor could perfect a security interest in a broadcast license. Rather, the court was rejecting the argument that a mortgage on the "hard assets" of a radio station must include the F.C.C. license because the F.C.C. would not permit a license to be transferred apart from the physical assets of the station, (a position later repudiated by the F.C.C. in *Bill Welch, supra*).

8. The case at bar is distinguishable from *In re Smith* upon examination of the nature of the proprietary rights sought to be enforced by the creditor in the instant case. In *Smith,* the creditor sought to abrogate a right of the licensee, i.e., its ability to freely initiate a transfer of a license. The right to initiate a transfer is a right granted by the terms of the license and is seriously impaired if it is subject to the dictates of a creditor. If a security interest were recognized by the court in *Smith* to the extent requested, the licensee would not have had the ability to freely exercise its rights under the license. This interference in the relationship between the licensee and the Federal government is precisely the evil the F.C.C. was attempting to avoid by the terms of its policy against the recognition of security interests outlined in *Merkley.*

9. However, the limited nature of the security interest claimed by Ameritrust in the instant case implicates none of these concerns. Ameritrust is not asserting any interest in the rights of the licensee *with respect to the F.C.C.* The right to transfer a license is a right between the F.C.C. and the licensee; the right to receive remuneration for the transfer is a right with respect

to the two private parties. It is this limited right in which Ameritrust claims to have perfected its security interest.

■ 10. Ameritrust is secured both pre-petition and postpetition by a first lien in certain of the debtor's real property and all of the debtor's personal property, including all of the debtor's accounts, chattel paper, instruments, documents, notes, equipment, furniture, fixtures, general intangibles and licenses (to the extent not prohibited by law). The security agreement and financing statements, carried forward postpetition by orders authorizing the debtor to use cash collateral and to obtain debtor-in-possession financing, contemplated the granting to Ameritrust of security interests in the debtor's broadcasting licenses. In addition, the loan documents asserted an interest in the debtor's "general intangibles." Under Article 9 of the Uniform Commercial Code, "general intangibles" are defined as "any personal property, including things in action, other than goods, accounts, chattel paper, documents, instruments and money." Md.Com.Law Code Ann. § 9–106 (Supp.1991). Governmental licenses of all types are generally considered to be "general intangibles" under the U.C.C., *i.e.*, property interests in which security interests may be perfected. *See Freightliner Market Dev. Corp. v. Silver Wheels Freightlines, Inc.,* 823 F.2d 362 (9th Cir. 1987) (distinguishing rights between government and licensee from rights between licensee and private third party and holding that Federal and state transportation operating authorities are "general intangibles"); *In re O'Neill's Shannon Village,* 750 F.2d 679 (8th Cir.1984) (liquor license is "general intangible" under U.C.C. § 9–106); *First Pennsylvania Bank, N.A. v. Wildwood Clam, Inc.,* 535 F.Supp. 266 (E.D.Pa.1982) (commercial clamming license is "general intangible"); *In re Genuario,* 109 B.R. 550 (Bankr.D.R.I.1989) (liquor license is "general intangible"); *In re Cleveland Freight Lines, Inc.,* 14 B.R. 777 (Bankr.N.D.Ohio 1981) (certificate of public convenience and necessity is "general intangible" and security interest attaches to proceeds of sale of certificate). *Contra In re Oklahoma City Broadcasting Co.,* 112 B.R. 425 (Bankr.W.D.Okla.1990) (F.C.C. broadcast license is not "general intangible" under U.C.C.).

11. For the foregoing reasons, this Court holds that a creditor may perfect a security interest in a debtor's F.C.C. broadcasting license, limited to the extent of the licensee's proprietary rights in the license vis-a-vis private third parties. The right of the licensee crucial to this decision (and the only right recognized by the Court in this case) is the right of the creditor to claim proceeds received by the debtor licensee from a private buyer in exchange for the transfer of the license to that buyer. The right to receive such proceeds is a private right of the licensee that constitutes a proprietary interest in which a creditor may perfect a security interest. It is this private right asserted against the assignee/transferee and not against the Federal government, in which Ameritrust may properly assert a security interest. Because a valid security interest *was* perfected in this case, Ameritrust is entitled to the value received from the transfer of the broadcast license in which it held a fully perfected security interest.

12. Prudence dictates that the narrow holding of this opinion be emphasized. The holding is not a recognition of a general right of creditors to take blanket security interests in broadcast licenses. Nor does the security interest recognized here entitle the creditor to "foreclose" on a broadcasting license (i.e., initiate an involuntary transfer of the license to the creditor) or to compel the initiation of a transfer or assignment of a license to a private third party. These are rights of the licensee vis-a-vis the F.C.C. and may not be abrogated by private agreement.

■ 13. After this Court announced its decision at the hearing on November 9, 1991, but before this opinion was committed to paper, the U.S. District Court for the Western District of Wisconsin (Crabb, D.J.) issued a contrary decision in the case of *New Bank of New England, N.A. v. Tak Communications, Inc. ("In re Tak Communications, Inc."),* 138 B.R. 568

(W.D.Wis.1992). In *Tak*, the court held that Federal law does not permit banks to perfect security interests in an F.C.C. license, sustaining on appeal a bankruptcy court's grant of summary judgment to a debtor in a declaratory judgment proceeding brought by the banks. The decision was not rendered in relation to a distribution of proceeds arising from a sale of a broadcasting license as a going concern approved by the F.C.C. as in the instant case. The decision appears to have been rendered without the apparent injustice which is present in the instant case, that of the debtor's insiders claiming against fully secured creditors the lion's share of proceeds from the sale of a radio station, the most valuable asset of which was the broadcasting license. This Court disagrees with the *Tak* decision because it was overbroad. The *Tak* court did not have to deny the secured claim of the banks in order to vindicate the legitimate concerns of the F.C.C. in regulating the use of the airways. The debtor argued its position as if it were interested in merely vindicating the policies of the F.C.C. The court adopted the debtor's arguments with the avowed purpose of addressing the concerns of the F.C.C. without addressing the more immediate concerns of the bankruptcy court of adjusting rights between creditors and debtors. The court stated that "Federal courts have jurisdiction to determine the validity of a lien asserted against the estate of a debtor, 28 U.S.C. s. 157(b)(2)(K), and to apply federal law," p. 579, but as has been indicated in the opinion of this Court, the *Tak* court applied the wrong federal law. Implicit in the decision is the legal conclusion that broadcasting licenses are not property of a debtor's bankruptcy estate under Section 541(a) of the Bankruptcy Code (which this Court believes to be incorrect). If the license is not property of the estate, it follows that a Federal court sitting in bankruptcy has no subject matter jurisdiction to render a decision on the issue presented of whether a security interest could be perfected in the non-asset. This is especially true where the F.C.C., whose policies are being asserted as a bar to such security interest, is not even a party to the contest.

At best, the bulk of the *Tak* court's holding is *dicta* after it held the license not to be an asset of the debtor's estate.

14. The sale at issue in the instant case included all of the physical assets of the debtor as well as the F.C.C. broadcast licenses. Because Ameritrust had a perfected security interest in all of the assets covered by the court-approved sale, the Court finds it unnecessary to address the issue of the valuation of the individual assets. The station was sold as a going-concern in an arms-length transaction and Ameritrust is entitled to the proceeds from the sale as approved by the Court. Ameritrust's motion to distribute proceeds is granted.

ORDER ACCORDINGLY.