**In re MEDIA PROPERTIES, INC., Puri Family Limited Partnership and Puri, LLC., Debtors.**

**Wells Fargo Foothill, Inc., Plaintiff,**

**v.**

**Michael E. Kepler, as Chapter 7 trustee of Media Properties, Inc. and Puri LLC, and Melvyn L. Hoffman, as Chapter 7 trustee of Puri Family Limited Partnership, Defendants.**

Bankruptcy No. 01–34476–7.
Adversary No. 03–00128–7.

United States Bankruptcy Court,
W.D. Wisconsin.

May 25, 2004.

Gerald Munitz, Goldberg, Kohn, Chicago, IL, for Plaintiff.

Michael E. Kepler, Madison, WI, for Defendants.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

On April 14, 2000, Media Properties, LLC ("Media") and TRP Communications, Inc. ("TRP") granted Wells Fargo Foothill, Inc. (f/k/a Foothill Capital Corporation) ("Foothill") a continuing security interest in all of their tangible and intangible personal property, including after-acquired personal property and fixtures. Foothill perfected its security interests. Included among TRP's property was a construction permit ("the license") issued by the Federal Communications Commission ("FCC") to operate television station WHPU TV 57 ("the station") in Madison, Wisconsin.

In connection with its loan agreements with Media and TRP, Foothill took a mortgage and security interest from Puri LLC ("Puri"). Foothill recorded its mortgage and perfected its security interest in all of Puri's currently owned and after-acquired tangible and intangible personal property, including the tower used to operate the station. In addition, Foothill and Puri Family Limited Partnership ("PFLP") entered into a security agreement, which granted Foothill a first-priority security interest in substantially all of PFLP's property, including all of PFLP's rights and interests in the capital, property, and profits of TRP.

On October 24, 2000, TRP defaulted under its loan agreement when it transferred the license to PFLP without notifying Foothill. Foothill learned of the license transfer in February 2001. In order to

maintain its security interest, Foothill obtained a new security agreement with PFLP ("PFLP Security Agreement") and filed a new financing statement. The PFLP Security Agreement granted Foothill the following:

> **Pledge and Security Interest.** As security for the Secured Obligations described in section 2, hereof, the Debtor hereby mortgages, pledges, grants and assigns as collateral to the Secured Party, and creates for the benefit of the Secured Party a continuing security interest in and Lien on, all of the tangible and intangible personal property and fixtures of the Debtor (but none of its obligations with respect thereto; and excepting only any FCC License of Debtor to the extent that a Lien thereon would cause or permit the revocation or loss of such FCC License) . . .
>
>> **(d)** All of the Debtor's general intangibles (including goodwill) and other intangible property and all rights thereunder, (Par. 1(d)).
>>
>> **(q)** all other property, assets and items of value of every kind and nature, tangible or intangible, absolute or contingent, legal or equitable; and . . . (Par. 1(q)).

On August 3, 2001, Media, Puri, and PFLP each filed for Chapter 11 Bankruptcy. The three cases are jointly administered. Michael Kepler is the Chapter 11 trustee for Media and Puri, and Melvyn Hoffman is the Chapter 11 trustee for PFLP, hereinafter "the Trustees."

On March 18, 2002, this Court entered an order authorizing and approving the sale of the station's assets, including the license, to Acme Communications ("Acme"). On July 25, 2002, the FCC approved the assignment of the license. On January 31, 2003, the sale of the station assets to Acme was closed. $3,895,793 of the proceeds were allocated to PFLP and approximately $1,700,000 were allocated to Media. Foothill has a claim against each of these debtors greater than the sums allocated to them.

Foothill contends that it has a first-priority, perfected secured interest in all of the sale proceeds because it has a first-priority lien in all tangible and intangible property of Media and Puri and in the general intangibles of PFLP. Foothill claims to be automatically perfected in the proceeds of the sale of all of the station's assets including the license.

The Trustees contend that Foothill's security interest in the license is limited to such "proceeds" as may have existed prior to bankruptcy, and there were none. They state that the proceeds of the sale of the station constitute "after-acquired property," which pursuant to 11 U.S.C. § 552,[1] is not subject to Foothill's pre-petition se-

---

1. 11 U.S.C. § 552 states:
    (a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
    (b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, or profits of such property, then such security interest extends to such proceeds, product, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.
    (2) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered

curity interest. As to the license, the Trustees rely on the language of 11 U.S.C. § 552(b), to claim that because Foothill could not have a perfected security interest in the license itself, it could assert no lien upon the proceeds of the sale of the license.

FCC broadcasting licenses are considered to be "general intangibles" under the Uniform Commercial Code. Generally, a security interest can be perfected in general intangibles. However, FCC broadcasting licenses have been treated differently due to the public trust upon which they are granted. In granting the licenses, the FCC exercises a regulatory function on behalf of the public, which cannot be usurped by a private party. Thus a creditor cannot, by acquiring a security interest in a broadcast license, limit its use or modify the terms under which it was issued. Nor may a creditor foreclose on a broadcast license because to do so might abridge the rights of licensee vis-a-vis the FCC, and those rights may not be abrogated by private agreement.

47 U.S.C. § 301 and 47 U.S.C. § 304 provide that a broadcast license issued by the Federal Communications Commission does not convey a property interest. A licensee's proprietary interest in the broadcast license does not allow a party to assert any rights contrary to the FCC's regulatory powers. *PBR Communications Sys. v. Jefferson Bank (In re PBR Communications Sys.)*, 172 B.R. 132 (Bankr.S.D.Fla.1994). The Federal Communication Commission reviews all transfers of licenses and does not permit a license to be assigned or transferred without the Commission's approval. "No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner . . . to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby." 47 U.S.C. § 310(d). "[This is done] to ensure . . . that the Federal Government retains control over use of the spectrum, consistent with 47 U.S.C. § 301 and 47 U.S.C. § 304." *In re Welch*, 3 F.C.C. 6502 (1988).

In *In re Merkley*, 94 F.C.C.2d 829, 1983 WL 182883 (1983), the FCC announced its position that a broadcast license, as distinguished from the station's plant or physical assets, is not an owned asset or vested property interest subject to a mortgage, lien, pledge, attachment, seizure, or similar property right. Relying on *In re Merkley* and the fact that the law itself seemed to imply the existence of a limited property right in an FCC license, the 7th Circuit Court of Appeals held in *In re Tak Communications, Inc.*, 985 F.2d 916, 918 (7th Cir.1993) that a creditor may not hold a security interest in an FCC license nor a security interest in the proceeds from the sale of an FCC license.

Shortly thereafter, in *In re Cheskey*, 9 F.C.C.R. 986, 987, 1994 WL 54752 (1994), the FCC spoke directly to the issues in *Tak* and stated its policy that "[a] security interest in the proceeds of the sale of a license does not violate Commission policy. . . . When a licensee gives a security

---

into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

interest in the proceeds of the sale of the system, including the license, the licensee's creditor has rights with respect to the money or other assets the licensee receives in exchange for the system and license. The creditor has no rights over the license itself, nor can it take any action under its security interest until there has been a transfer which yields proceeds subject to the security interest." *In re Cheskey,* 9 F.C.C.R. 986, 987 (1994). The FCC determined that the Circuit Court had erred and that the ruling in *Tak* "cannot bind the Commission to a policy which it does not have." *In re Cheskey,* 9 F.C.C.R. 986, 987 (fn.8) (1994). "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

■ The Trustees contend that Foothill took a security interest in the proceeds of the sale of the FCC license without obtaining a security interest in the underlying FCC license. Proceeds were not generated until the post-petition sale of the FCC license. Because proceeds from the sale of the licenses did not exist pre-petition, the Trustees believe that the creditor is, at best, an unsecured creditor of the estate. This argument depends on the glass being half empty—that is to say that the security interest of Foothill was in no more than the proceeds.

Foothill contends that it had a security interest in all of the debtors' tangible and intangible property, including the FCC license to the extent permitted by law. Foothill believes that the security interest attached pre-petition to the debtors' general intangibles, specifically the private right to sell the FCC license with FCC approval and retain the proceeds of the sale. Foothill cites to cases such as *NBD Park Ridge Bank v. SRJ Enters., Inc.,* 150

B.R. 933, 941 (Bankr.N.D.Ill.1993), where the Bankruptcy Court held that a debtor's market share value constitutes pre-petition intangible property, and that a post-petition sale constitutes the proceeds of that intangible property. Thus, for Foothill, the glass is half full—that is to say that the security interest covered not only proceeds of sale, but all attributes of the license not specifically determined to be reserved to the FCC.

■ Foothill's security agreement and financing statement assert an interest in the debtors' "general intangibles." General intangibles are defined in UCC § 9–102(42) as "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money." Governmental licenses are usually said to be general intangibles under this definition. See *Freightliner Market Dev. Corp. v. Silver Wheel Freightlines, Inc.,* 823 F.2d 362 (9th Cir.1987) (distinguishing rights between government and licensee from rights between licensee and private third party and holding that federal and state transportation operating licenses are general intangibles); *In re O'Neill's Shannon Village,* 750 F.2d 679 (8th Cir. 1984) (liquor license is general intangible under UCC § 9–106); *First Pennsylvania Bank, N.A. v. Wildwood Clam Co.,* 535 F.Supp. 266 (E.D.Pa.1982) (commercial clamming license is general intangible); *In re Genuario,* 109 B.R. 550 (Bankr. D.R.I.1989) (liquor license is general intangible); *In re Cleveland Freight Lines, Inc.,* 14 B.R. 777 (Bankr.N.D.Ohio 1981) (certificate of public convenience and necessity is general intangible and security interest attaches to proceeds of sale of certificate).

■ Broadcast licenses, as general intangibles, are said to have special charac-

teristics. "[T]he validity of security interest in a broadcast license ... [is] limited to licensee's property rights in relation to third parties." *PBR Communications Sys. v. Jefferson Bank (In re PBR Communications Sys.)*, 172 B.R. 132, 135 (Bankr.S.D.Fla.1994); See *In re Ridgely Communications, Inc.*, 139 B.R. 374, 379 (Bankr.D.Md.1992) (a broadcast license is property within the Bankruptcy Code's definition of the debtor's estate; creditors may hold liens in broadcast licenses, restricted to the extent of the licensee's proprietary rights in the license vis-a-vis private third parties). "[A] creditor could be granted a bare security interest in debtor's ... broadcast licenses, consistent with the requirements of the Federal Communications Act, as long as the security interest granted was only an interest against proceeds from the sale of licenses, with no right to take possession of the licenses." *State St. Bank & Trust Co. v. Arrow Communications*, 833 F.Supp. 41, 48–49 (D.Mass.1993).

In *In re Ridgely Communications, Inc.*, 139 B.R. 374 (Bankr.D.Md.1992), the Bankruptcy Court reasoned that "rights between licensees and the Commission are to be distinguished from rights between the licensee and a private third party." *In re Ridgely*, 139 B.R. at 377–79. The Bankruptcy Court recognized a distinction between a licensee's right to transfer its license (a "public" right between the FCC and the licensee which is governed by the FCC) and the licensee's right to receive value for a transfer of the license (a "private" right between two parties). See *In re Ridgely*, 139 B.R. at 378–79. The court held that a security interest in the proceeds of an FCC approved sale of a broadcast license did not interfere with the FCC's authority and mandate under the Communications Act to regulate the use of broadcast frequencies and that creditors could perfect a security interest in the private right of the proceeds from an FCC approved sale of a broadcast license.

"While this proprietary interest does not allow any party to assert any rights contrary to the FCC's regulatory powers, the holder of a license may receive proceeds from the transfer of the license to a third party." *PBR Communications Sys. v. Jefferson Bank (In re PBR Communications Sys.)*, 172 B.R. 132 (Bankr. S.D.Fla.1994). The right to receive the proceeds of an approved sale is a private right that a party can give to its creditors. *State St. Bank & Trust Co. v. Arrow Communications*, 833 F.Supp. 41 (D.Mass. 1993); *In re Ridgely*, 139 B.R. 374 (Bankr. D.Md.1992) (debtor's broadcast license is a general intangible; a creditor can perfect security interest in proceeds of its transfer). "This limited interest allows for the enforceability of a security interest in the proceeds of an FCC approved sale." *PBR Communications Sys. v. Jefferson Bank (In re PBR Communications Sys.)*, 172 B.R. 132, 134 (Bankr.S.D.Fla.1994); see also *In re Atlantic Business Community Dev. Corp.*, 994 F.2d 1069 (3rd Cir.1993) (allowing IRS to assert a tax lien against the proceeds of a sale of the debtor's FCC license). "[A] contrary outcome would mean that the distinction between private and public interests in FCC license proceeds ... would have no meaning, and the private interests would be devoid of value." *MLQ Investors, L.P. v. Pacific Quadracasting*, 146 F.3d 746, 749 (9th Cir.1998).

It seems clear that since *Tak* the FCC and the courts considering the issue have found the glass to be at least half full. A creditor can, as Foothill has, take a security interest in all rights of the licensee against third parties, which is more than just proceeds of a sale. After those prerogatives exclusive to the FCC are carved out, there remains an interest in the license which may be subjected to a security interest which would continue in

proceeds of those interests by operation of law. UCC § 9–203(g). Thus, when the license is sold, the existing security is liquidated. Such a security interest avoids the effects of 11 U.S.C. § 552. It is thus irrelevant that, as the Trustees contend, at the time of the original loan agreements there were no "proceeds" in existence. The proceeds now held and disputed were generated from the sale of property in which Foothill had a perfected security interest at the time these cases were filed. Proceeds derived from the approved sale of the FCC license are understood to be the proceeds of that general intangible. "11 U.S.C. § 552(b) gives the bankruptcy court considerable latitude in applying pre-petition security interests to post-petition proceeds." *United Virginia Bank v. Slab Fork Coal Co.*, 784 F.2d 1188, 1191 (4th Cir.1986). The proceeds of sale must be distributed to Foothill. It may be so ordered.