### In re AIRADIGM COMMUNICATIONS, INC.

### Federal Communications Commission, Appellant/Appellee,

### v.

### Airadigm Communications, Inc., Appellee/Appellant.

### Nos. 06–C–747–S, 07–C–073–S.

United States District Court, W.D. Wisconsin.

April 17, 2007.

---

Kathryn A. Pamenter, Attorney at Law, Chicago, IL, for Appellee/Appellant.

Mary A. Defalaise, Commercial Litigation Branch, Washington, DC, for Appellant/Appellee.

## MEMORANDUM AND ORDER

JOHN C. SHABAZ, District Judge.

These are appeals from two final orders of the Bankruptcy Court: an October 27, 2006 summary judgment order in an adversary proceeding determining the rights of the parties concerning certain public airwave licenses purchased on installment by the debtor from the Federal Communications Commission (FCC), and an order of October 31, 2006 confirming the 2006 chapter 11 reorganization plan of the debtor, Airadigm Communications, Inc. This Court has jurisdiction over the appeals pursuant to 28 U.S.C. § 158(a)(1). The following is a summary of relevant undisputed facts and proceedings before the Bankruptcy Court.

## BACKGROUND

In 1997 debtor was the successful bidder on 15 licenses ("licenses") that permit it to provide wireless communication services. Debtor made a down payment to the FCC and agreed to pay future installments on the $64,000,000 balance due. The FCC retained security interests in the licenses and filed UCC financing statements for the security interests. It filed UCC continuation statements for the security interests in 2006, more than five years after the original financing statements were filed.

In 1999 debtor file a chapter 11 bankruptcy petition. The FCC took the position that the licenses had been automatically cancelled as a result of the bankruptcy filing. Debtor filed a petition to waive the automatic cancellation or reinstate the licenses. In 2000 the Bankruptcy Court confirmed debtor's proposed reorganization plan ("2000 plan") over the FCC's objection. The 2000 plan included the following provisions: (1) the FCC had an allowed claim of $64,219,442.55; (2) Telephone and Data Systems, Inc. ("TDS") and another party agreed to make a reinstatement loan sufficient to pay the FCC's claim in full if the licenses were reinstated by February 2001; (3) If the FCC did not reinstate the licenses by February 2001, but did so by June 2002, TDS had the option of completing the transaction. (4) In the event the FCC "either denies reinstatement of all Licenses, or fails to act on the Petitions for Reinstatement in a timely manner," an alternate plan was to be instituted whereby TDS acquired all assets except the licenses. (5) The 2000 plan made no provision for disposition of the licenses under the alternate plan.

The FCC did not act on the reinstatement petition by June 2002. TDS acquired the non-license assets in accordance with the alternate plan. On January 27, 2003 the United States Supreme Court issued a decision in *Federal Communications Commission v. NextWave Personal Communications, Inc.*, 537 U.S. 293, 123 S.Ct. 832, 154 L.Ed.2d 863, invalidating the FCC's automatic cancellation rule. On August 8, 2003 the FCC denied debtor's petition for reinstatement as moot, ruling that based on *NextWave* the licenses had never been cancelled.

On May 8, 2006 debtor filed a second chapter 11 bankruptcy petition. On June 12, 2006 the Bankruptcy Court determined that the 2000 plan had been substantially consummated and ordered the 1999 estate closed. On June 13, 2006 debtor filed an amended plan of reorganization ("2006 plan"). Under the terms of the 2006 Plan the FCC is to be paid in cash the secured amount of its claims as determined by the bankruptcy court. Upon such payment the FCC's liens are released. Alternatively, if the FCC exercises its right under 11 U.S.C. § 1111(b) it will retain its lien and be paid proceeds of U.S. Treasury securities or "A" rated insurance annuity contracts purchased with the cash equivalent of the licenses' value as determined by the Bankruptcy Court so that the FCC will receive over 30 years, deferred cash payments totaling the full amount of its secured claim, of a value of the licenses as of the effective date.

The 2006 Plan also included the following provision:

On the Effective Date, any and all Claims of the Debtor against TDS shall be released and forever discharged. Except as expressly provided in this Plan, as of the Effective Date, neither TDS, its affiliates, parents or subsidiaries, nor any of its respective members, shareholders, officers, directors, employees, agents attorneys or professionals shall have or incur any liability to the Debtor, the Reorganized debtor, or to any holder of any Claim or equity interest for any act or omission arising out of or in connection with the Case, the confirmation of this Plan, the consummation of this Plan or property to be distributed under this Plan, except for willful misconduct.

On June 30, 2006 debtor commenced an adversary proceeding to determine the validity, priority or extent of the FCC liens on the licenses. Debtor contended that the liens were avoidable pursuant to 11 U.S.C. § 544(a) because they were unperfected by virtue of failure to file timely financing statement extensions. Alternatively, debtor argued that the liens had been extinguished by the 2000 Plan. The FCC opposed both positions, raised numerous defenses and counterclaimed for a declaration that it had an independent regulatory priority right to receive the full amount of its $64,000,000 and that the total amount of the claim should be treated as secured. The parties agreed that there were no material factual disputes relevant to the issues presented.

On October 27 2006 the Bankruptcy Court issued a memorandum decision resolving all issues in the adversary proceeding. The Bankruptcy Court held the FCC retained a perfected security interest in the licenses which had not been extinguished by the 1999 bankruptcy. It further held that the FCC's claims were partially secured, were subject to bifurcation pursuant to 11 U.S.C. § 506(a) and, pursuant to a previous finding, the amount of the FCC's allowed secured claim was $33,009,164.

On October 31, 2006 the Bankruptcy Court confirmed the 2006 plan over the objections of the FCC. In response to the FCC's specific objections the Bankruptcy Court ruled that it was not impermissible for the plan to release TDS for liability "arising out of or in connection with the Case ... except for willful misconduct." It further ruled that the Plan's treatment of the FCC's claim in the event it made a § 1111(b)(2) claim met the requirements of the bankruptcy code. Finally, the Bankruptcy Court found that the plan was proposed in good faith.

## MEMORANDUM

The parties have cross appealed from the Bankruptcy Court's summary judg-

ment order in the adversary proceeding. Debtor seeks review of the rulings that the FCC's liens survived the 1999 bankruptcy and cannot be defeated by the trustee's strong arm avoidance powers. The FCC seeks reversal of the Bankruptcy Court's determination that its claim could properly be bifurcated under 11 U.S.C. § 506. Concerning its appeal from the confirmation order, the FCC renews its three challenges to the plan confirmation which were rejected by the Bankruptcy Court: (1) the plan improperly releases non-debtor TDS from the FCC's claims; (2) the plan fails to comply with sections 1111(b) and 1129(b)(2)(a) of the bankruptcy code; (3) the plan was not proposed in good faith because it ignores the obligations of the 2000 plan.

■ The Court evaluates *de novo* the legal issues resolved by the Bankruptcy Court in its final orders. *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir.2004). Findings of fact are accepted unless clearly erroneous. *Id.*

*Status of the FCC liens*

The Bankruptcy Court correctly determined that the FCC liens survived both the 2000 plan and the trustee's strong arm. It also correctly ruled that the FCC's secured claim was subject to bifurcation under § 506.

■ **Effect of 2000 Plan.** Considering first the effect of the confirmation of the 2000 plan on the liens, 11 U.S.C. § 1141(c) provides that "after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors. . . ." Under this provision, if a secured creditor participates in a bankruptcy reorganization and the plan does not provide for the preservation the creditor's lien, the lien is extinguished. *Matter of Penrod*, 50 F.3d 459, 462 (7th Cir.1995). Debtor contends that this ap-

plies to the FCC because the licenses were ultimately found to be continuously in effect and therefore were part of the plan and the FCC's liens were extinguished. The issue is whether the licenses were "dealt with" by the plan within the meaning of § 1141(c).

The plan provided for different treatments of assets depending on how circumstances evolved. If the FCC had granted reinstatement of the licenses by either of the deadlines in the plan, the licenses would be controlled by the debtor, funding of the costs would be forthcoming and the FCC's claim would be paid in full. Had these circumstances occurred the plan would have dealt with the licenses and the liens would have been extinguished. However, if the licenses were not reinstated, the plan did not deal with them, proceeding as if they were never part of the estate. Instead, under the circumstances as they unfolded, the other plan assets were to be acquired by TDS and no action was taken with respect to the licenses. That is, the plan only "dealt with" the licenses if there was a reinstatement order by the FCC, a prerequisite which never occurred. Extinguishment of the lien occurs only if the creditor "participated in the reorganization." *Penrod*, 50 F.3d at 463. The FCC did not participate. In fact, by refusing to reinstate the licenses the FCC expressly chose not to participate in the reorganization, or have the licenses dealt with by the plan, and thereby avoided any effect on the survival of its lien.

As the Bankruptcy Court correctly noted, at the time of confirmation all parties believed that the licenses had been cancelled, thereby completely foreclosing the security interest in the license and leaving nothing to deal with in the plan. There was no reason for the plan to address them. Any provision in the plan affecting the licenses were contingent on reinstate-

ment. The parties might have anticipated the Supreme Court ruling in *NextWave* and provided for a further contingency in the plan, but they did not. Consequently, *NextWave's* retroactive negating of the license cancellations does not render them "dealt with" by the plan.

■ **Applicability of § 544 Lien Avoidance.** The bankruptcy trustee may avoid any lien "voidable by ... a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains ... a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien...." The Bankruptcy Court held that the FCC's security interests in the licenses remained perfected at all times and therefore could not have been voided by a hypothetical lien creditor. Specifically, the Court found that although perfection lapsed under the applicable state Uniform Commercial Code provisions, federal common law governs the issue of perfection and under the federal common law "choateness doctrine" the interest remains perfected. *See Jersey State Bank v. United States,* 926 F.2d 621 (7th Cir.1991).

■ The Court makes no finding on the correctness of the perfection analysis because there is an independent basis upon which the Bankruptcy Court must be affirmed: even an unperfected FCC security interest in the licenses could not be defeated by a judicial lien creditor. A creditor other than the FCC cannot hold a lien in an FCC license, but can only acquire rights in proceeds from the sale of a license to a third party. *In re Media Properties, Inc.,* 311 B.R. 244, 247–248 (Bankr.W.D.Wis.2004)(collecting and summarizing law governing the acquisition of interests in FCC licenses). A judicial lien would not attach to the license itself and the lien holder can only recover on its lien after there has been a transfer which

yields proceeds. *Id.* Neither a judicial lien creditor nor a consensual lien creditor can acquire an interest in the license superior to that of the FCC. As a result, a trustee exercising authority under § 544(b) cannot avoid the FCC's lien, perfected or unperfected.

Debtor argues at great length that there is no meaningful distinction between a lien on proceeds and a lien on the license. This is manifestly false in light of the FCC's undisputed authority to approve (or disapprove) any sale of the licenses. The FCC's authority to control transfer of the licenses assures that there will never be a sale, or proceeds from a sale, except under circumstances acceptable to it. Presumably those circumstances would involve payment on its outstanding secured claim.

■ **Section 506 Bifurcation of FCC claim.** The FCC argues that its right to full payment is a regulatory condition not susceptible to impairment in bankruptcy and therefore not subject to bifurcation between secured and unsecured components pursuant to § 506. The Bankruptcy Court rejected this argument, finding that *NextWave* controlled the issue and held that the FCC's claim is treated as any other secured claim. The FCC argues that *NextWave* is properly limited to § 525 of the bankruptcy code and does not apply to impair its broader regulatory authority. The Court now affirms the conclusion of the Bankruptcy Court.

*NextWave* holds that debtor's obligation on the licenses is a "debt" and the FCC's right to payment is a "claim" within the meaning of the bankruptcy code. Consequently, § 506 which applies to "an allowed claim of a creditor secured by a lien" is literally applicable to the FCC's claim for installment payments on the licenses. The FCC argues that the full payment condition in the license is essential to the

competitive bidding provision of the Communications Act and should therefor prevail in a conflict with the bankruptcy code. This position was squarely rejected by *NextWave*:

It does not, as petitioners contend, obstruct the auctioning provisions of 47 U.S.C. § 309(j), since nothing in those provisions demands that cancellation be the sanction for failure to make agreed-upon periodic payments. Indeed, nothing in those provisions even requires the Commission to permit payment to be made over time rather than leaving it to the impecunious bidders to finance the full purchase price with private lenders. What petitioners describe as a conflict boils down to nothing more than a policy preference on the FCC's part for (1)selling licenses on credit and (2) canceling licenses rather than asserting security interests in them where there is a default. Such administrative preferences cannot be the basis for denying respondent rights provided by the plain terms of the law.

537 U.S. at 304, 123 S.Ct. 832. This analysis applies equally to the debtor's rights under § 506. *NextWave* makes clear that in terms of its ability to recover on its secured claim for periodic payments, the FCC is treated no differently in bankruptcy than other secured creditors.

Accordingly, the summary judgment decision of the Bankruptcy Court in the adversary proceeding is affirmed in all respects.

*Plan Confirmation*

The FCC argues that the Bankruptcy Court erred in confirming the 2006 plan because the plan violates §§ 524(e) and 1111(b) of the Bankruptcy Code and was proposed in bad faith. The Bankruptcy Court considered and rejected each argument.

■ **Release of TDS, § 524(e).** Section 524(e) provides that "discharge of a debt of the debtor does not affect the liability of any other entity on ... such debt." It does not expressly address the propriety of a plan provision which provides protection or discharge to a third party.

Appellants seem to be arguing for a much broader reading of section 524(e), one that would preclude a reorganization from granting releases to any party other than the debtor. But section 524(e) provides only that a discharge does not affect the liability of third parties. This language does not purport to limit or restrain the power of the bankruptcy court to otherwise grant a release to a third party.

*Matter of Specialty Equipment Cos., Inc.*, 3 F.3d 1043, 1047 (7th Cir.1993). Accordingly, the issue is not one of the authority of the Bankruptcy Court to approve a plan provision releasing TDS from certain liabilities, but rather the propriety of including the provision under the particular circumstances.

■ Releases of third parties are generally permitted only under limited circumstances. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142–43 (2d Cir.2005)(discussing various circumstances where such provisions have been approved). Common among judicial considerations have been the extent of contribution to the estate by the released party, the importance of the release to consummation of the plan and the breadth of the release. *Id.* The Bankruptcy Court found that the $33,000,000 loan by TDS was critical to the reorganization and that there was no other potential source of financing for the reorganization. It further found that the release was necessary to obtain the funding and that the exceptions from release for willful misconduct, and the preservation of the FCC's regulatory

rights in the licenses substantially limited the scope of the release as applied to the FCC. Accordingly, the Bankruptcy Court found that circumstances justified the release.

The Bankruptcy Court's findings of fact are reasonable and its legal conclusion permitting the release as a plan provision is affirmed. The release applies only to (1)obligations to the debtor and (2) liability arising from TDS's participation in the reorganization. Such a release is far narrower than the release of third party guarantors which have been rejected as inappropriate. *See, e.g., Union Carbide Corp. v. Newboles,* 686 F.2d 593 (7th Cir.1982). The present plan releases only obligations that arise from participation in the plan and are required to secure the essential participation in the plan. This is a unique circumstance warranting confirmation of a plan containing a third party release.

**Compliance with §§ 1111(b) and 1129.** In order to confirm the plan over the FCC's objection, the plan must comply with the requirements of 11 U.S.C. § 1129. The FCC's total claim is $64,219,422.55. The bankruptcy Court found the present value of the licenses to be $33,009,164. The 2006 plan (¶ 5.2(b)) provides for full payment in cash of the present value of the licenses in the event that the FCC does not elect treatment under § 1111(b). There is no dispute that this provision satisfies § 1129.

The FCC disputes, however, that the plan complies with § 1129(b)(2)(A) in the event it makes election for treatment under § 1111(b). In the event of an 1111(b) election the 2006 Plan provides: (1) that the FCC shall retain its lien for the full amount of its claim, (2) that debtor will purchase and hold for the FCC's benefit U.S. Government securities or "A" rated insurance company annuity contracts having a term of thirty years and deferred cash payments totaling at least the full amount of the FCC's allowed claim, (3) When the FCC has received payments exceeding its total allowed claim its claim is satisfied.

The FCC argues that this provision fails to comply with § 1129(b)(2)(A) because the plan does not preserve its "due on sale" provision, therefore the FCC does not "retain its liens" within the meaning of § 1129(b)(2)(A)(i)(I). Additionally, the FCC contends that the steam of payments from investments under the plan do not have a present value equal to the $33 million value determined to be the present value of the licenses by the bankruptcy Court as required by § 1129(b)(2)(A)(i)(II).

 Concerning the first argument, § 1129(b)(2)(A)(i)(I) requires only that the FCC retain its lien securing the claim, which it does under the terms of the 2006 plan unless and until its claim is fully paid. To overcome this apparent compliance the FCC argues that a "due-on-sale" clause is a component of the lien. Not surprisingly, the FCC offers no authority which conflates a due-on-sale clause into a lien. A due-on-sale clause is not a lien. It is a contractual right to accelerate the payment period for a debt upon the sale of property that secures the debt. A lien is "a charge against or interest in property to secure payment of a debt." 11 U.S.C. § 101(37). A contractual right to accelerate payment on sale of collateral is entirely distinct from the lien itself. To be sure, it is a valuable contractual right (just as the cancellation right was in *NextWave),* but that does not make it a lien and does not bring it within the requirements of § 1129(b)(2)(A). To the extent that the due-on-sale provision is a regulatory right of the FCC, rather than a mere contractual right, it may be preserved by ¶ 10.5 of the 2006 plan. However, it is not required

to be preserved as a "lien" pursuant to § 1129.

■ The FCC's second argument is that the stream of payments from the government securities or insurance annuity contracts will not be high enough to provide a present value equal to their cost. This argument was not considered by the Bankruptcy Court apparently because it was not raised there by the FCC. Nevertheless, even assuming the argument was preserved in the bankruptcy court, it is meritless. The plan requires defendant to purchase default-risk free investments and hold them as payment under the plan. Such investments, purchased at market value with the cash equivalent of the value of the collateral by definition have a present value equal to the purchase price. The FCC's objection appears to be primarily that the provision that the securities will "be held for the benefit of [the FCC], but in the name of the Reorganized Debtor" is somehow not sufficient assurance that the securities will be so held. Such an objection goes not to the value of the payment stream but to the nature of the procedures for holding and distributing that stream and could have been readily addressed and modified in the Bankruptcy Court had an objection been raised. Because it was not, and because the 2006 plan complies in a practical and fundamentally indisputable way with the requirement that the FCC be paid the present value of the licenses, its objection on that basis is rejected.

■ **Good Faith in Filing.** The FCC argues that the 2006 plan was not proposed in good faith as required by § 1129(a)(3) because it constitutes an effort by the debtor to evade its responsibilities under the 2000 plan. In general, Courts have held that serial reorganizations which effectively evade obligations of a prior, substantially consummated reorganization are impermissible. *In re Jartran,*

*Inc.,* 886 F.2d 859, 867 (7th Cir.1989). To permit such a plan would permit the debtor to circumvent the prohibition against modifying a plan after substantial consummation. 11 U.S.C. § 1127(b). *Id.* The present issue is whether the 2006 plan is an improper attempt to modify and evade the requirements of the 2000 plan. This Court now joins the Bankruptcy Court in concluding that the 2006 plan was not such an attempt to evade the responsibilities of the 2000 plan, but is rather a permissible serial reorganization.

The 2006 plan became necessary because circumstances evolved after confirmation of the 2000 plan not within the contemplation of the parties or dealt with by the provisions of the 2000 plan. The 2000 plan was premised on the assumption that the licenses had been canceled and would only become part of the estate if they were reinstated by the FCC. Accordingly, the plan provided for two possibilities: reinstatement would occur and the reorganization would proceed with the licenses or reinstatement would be denied and the reorganization would proceed without them. Actual events unfolded in an unanticipated third scenario. First, the FCC refused to act on granting or refusing the reinstatement petition as contemplated by the plan. Then, the Supreme Court ruling in *NextWave* prompted the FCC to conclude that the licenses had in fact never been cancelled. The 2000 plan, having failed to contemplate this possibility, was simply not equipped to deal with the circumstances.

The 2006 plan was not an effort to evade the full consummation of the 2000 plan but a good faith proposal to facilitate reorganization under the unanticipated circumstances. The Bankruptcy Court's thoughtful discussion concerning the necessity, efficiencies and likely success of the 2006 plan and its conclusion that credi-

tors, including the FCC, will probably recover more under the 2006 plan than in liquidation is reasonable and supported by the facts before it at the confirmation hearing. Accordingly, the Bankruptcy Court reasonably concluded that the 2006 plan was proposed in good faith.

## ORDER

IT IS ORDERED that the summary judgment decision of the Bankruptcy Court in the adversary proceeding is AFFIRMED.

IT IS FURTHER ORDERED that the decision of the Bankruptcy Court confirming the debtor's plan is AFFIRMED.